**Gardie Nelson BRYANT, J. B. McCarley and Louise Cory, Appellants,**

**v.**

**STANDARD LIFE AND ACCIDENT INSURANCE COMPANY, Appellee.**

**No. 21038.**

United States Court of Appeals
Fifth Circuit.

July 19, 1965.

W. P. Sturdivant, Amarillo, Tex., Frank D. McCown, Dumas, Tex., Simpson, Adkins, Fullingim & Hankins, Amarillo, Tex., for appellants.

John A. Johnson, of Savage, Gibson, Benefield & Shelton, Oklahoma City, Okl., for appellee.

Before BROWN and WISDOM, Circuit Judges, and ESTES, District Judge.

JOHN R. BROWN, Circuit Judge.

The basic question is whether each of two life insurance policies in suit, when construed with the formal application, contained a good health provision. It is really without dispute that at the time of delivery of the policy, the Assured was not in good health. On the completion of all testimony, the Judge took the case from the jury and directed the entry of a judgment for the Insurer presumably on the ground that the policies required good health at time of delivery. The named beneficiaries appeal. We reverse.

The two policies, one referred to as the Bryant policy, the other as McCarley, identical in form and following substantially the same time table [1] were issued on the life of Hattie Coffee Bryant, aged 61. The applications included the report of the medical examination made by the Insurer's examining physician. Each application revealed a number of medical conditions reflected by the Assured's history and the examining physician's opinions thereon. There was no suspicion of cancer and under the theory pursued on the trial below, the Insurer expressly disclaimed any contention that the Assured made any misrepresentation either innocently or fraudulently in the applications. But within a short time the Assured's condition changed markedly beginning in early December. On January 9, 1961, just a day or so after physical delivery of the policies,[2] the Assured was examined by a specialist in Oklahoma City whose diagnosis was cancer of the cervix. From this cause she died about nine months later, September 26, 1961. It is, of course, uncontradicted through testimony of the Insurer's underwriter that insurance would not be effected on the life of one having an active condition of cervical cancer. It is likewise uncontradicted that had the Insurer been informed of the symptoms and conditions developing during December 1960, the underwriter would not have approved the issuance of any policy.

In support of the District Judge's ruling, the Insurer makes two principal contentions. The first is that each policy when construed with the attached application has a built-in good health provision which obviously was not satisfied on the date of delivery in January 1961. The second is that, independent of express or implied provisions of the policy-application, Texas law effectually reads in a good health requirement at least to the extent of calling for a complete disclosure by the Assured of all significant, relevant, medical facts occurring between the time of application and delivery of the policy.

The beneficiaries, on the other hand, assert that the policy itself has no good health provision, and this is clearly so. Next, no good health provision is read in because the terms of the application automatically exclude the good health requirement where, as here, the first full premium specified is paid with the application. In that situation the application expressly relegates the parties to

1.

| | | I<br>Bryant | II<br>McCarley |
|---|---|---|---|
| (a) | Amount | $27,700.00 | $10,000.00 |
| (b) | Beneficiary | Bryant<br>(husband) | McCarley-Cory<br>(bro.-sister) |
| (c) | Date of Application | Nov. 2, 1960 | Nov. 29, 1960 |
| (d) | Date of payment first premium | Nov. 2, 1960 | Nov. 29, 1960 |
| (e) | Amount premium paid | $143.93 | $52.25 |
| (f) | Date of policy | Dec. 19, 1960 | Dec. 19, 1960 |
| (g) | Delivery of policy | Jan. 8, 1961 · | Jan. 7, 1961 |
| (h) | Amount additional premium | $41.94 | $14.85 |
| (j) | Payment additional first premium | Jan. 8, 1961 | Jan. 30, 1961 |

2. The Bryant policy as "rated-up" was formally accepted and the added premium was paid the same date (see Item I(g) (j) (h)) whereas the added premium for McCarley was not paid until January 30, 1961 (Item II(h) (j), note 1, supra).

In the form issued on December 19, 1960 (Item I, II(f)), the policies had been "rated up" as "Table 2B" principally because of high blood pressure and the history of urethral stricture. There was a corresponding increase in the monthly premium (see Item I, II(h), note 1, supra).

the receipt which may not be looked to since admittedly it was not attached to the policies as required by the Texas Insurance Code.[3]

Before analyzing the terminology of the policy-application to determine the presence or absence of a good health provision, it simplifies matters to first dispose of the Insurer's second contention. *Erie*-Texas bound as we are, we find ourselves in substantial agreement with the Insurer's contention. Likewise, for the *Erie*-look we here take the synthesis of the latest and highest writing Court, Ford Motor Co. v. Mathis, 5 Cir., 1963, 322 F.2d 267, 269, even though the prosecutors' dissection of some of the case-materials might raise some doubt that the precedential support is as firm as thought.

Thus Moore v. American Home Mut. Life Ins. Co., Tex.Civ.App.1943, writ ref'd w. o. m., 174 S.W.2d 788, cites and approves the earlier Texas case of Phipps v. American Natl. Ins. Co., Tex.Civ.App., writ dism'd, 1938, 116 S.W. 2d 800, 803–804, which in turn cited Forrester v. Southland Life Ins. Co., Tex. Civ.App.1931, 43 S.W.2d 127, 129, plus the pre-*Erie* celebrated case of Stipchich v. Metropolitan Life Ins. Co., 1928, 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895. These cases stand for the proposition that because of the necessity for the utmost good faith between the assured and the insurer, even though there is no good health provision in the policy the contract never comes into existence if there is a failure on the part of the assured to disclose known material facts arising between the time of application and policy delivery.

Although this certainly was an issue in the case, it cannot sustain the trial Court's direction of a judgment for the Insurer. On the record as made here, this was at most a question for the jury. On this we assay this record—with no

intimations of what the next record might reflect—as did the trial Judge. The extended colloquy between Court and counsel in the arguments for a peremptory direction at the close of all the evidence was revealing. The trial Judge pointed out that this contention of the Insurer rested on awareness on the part of the Assured of two things. The first was an awareness of these intervening physical facts about her medical condition. The second, perhaps more important, was knowledge of their likely medical significance in relation to the issuance of life insurance.

There are plenty of facts and circumstances which would warrant a jury finding such an awareness on the part of the Assured, but this is a far cry from declaring it established as a matter of law. The medical examinations by the Insured's doctor had recently been made. He had reviewed the Assured's history which revealed that in the repeated microscopic tests for cancer, all of the "pap" tests had been negative. There was then no indication of any malignancy, no symptoms of cancer, and the conclusion was that she had none. True, between about December 18 and December 29, 1960, some rather extensive bleeding commenced. But her urologist felt unqualified to make a diagnosis. On December 29, 1960, she entered a Texas hospital for an upper respiratory infection and was discharged January 3, 1961. No finding was there made of cancer, although the history revealed the recent bleeding. Some time previously, the exact date not being fixed, an appointment had been made to see Dr. Kelso at Oklahoma City where on admission January 9, 1961, the history reflected hemorrhage of "three weeks" duration. These facts, especially when considered in the light of unrevealing statements by Mr. Bryant and the Assured about the "trip" they were taking to the "East" would certainly warrant a jury finding that both

---

3. Tex.Ins.Code art. 21.24, V.A.T.S. "Every policy of insurance issued or delivered within this State by any life insurance company doing business within this State shall contain the entire contract between the parties, and the application therefor may be made a part thereof."

the Assured and her husband knew she was in serious condition possibly suffering from cancer. On the other hand, while Dr. Kelso's reputation as a cancer specialist seemed to be well recognized by all counsel and the various doctor witnesses, the evidence was at best arguable that the Assured [4] knew of this, or that any of her medical advisers or family had informed her of her likely condition. The Texas doctors in mid-late December had not diagnosed cancer. It would be odd if we as Judges were to hold that a lay person must have known more than her treating physicians found.

Although we may not, and would not if we could, minimize the requirement of good faith dealing between assured and insurer in the critical moments between application and delivery, it is evident that for the duty to arise, the assured or other appropriate party has to have knowledge of (a) the physical developments, and (b) at least some awareness of their medical significance to one underwriting the risk. In a day when medicine is such a stratified specialty with serious maladies being diagnosed finally by experts on the basis of minute and frequently unspectacular routine incidents in a patient's history, there has to be some limit to the sort of disclosure which must be made as the eager solicitor hands over the policy. Of course, sometimes that knowledge and awareness of both fact and significance will be so plain as to compel an answer as a matter of law. More frequently, bound up as it is with subjective knowledge and the ever present possibility that people close to the patient are deliberately concealing the awful truth, the issue must be assayed by the jury. So it was here.

This means that to sustain the peremptory direction of a judgment in its behalf, the Insurer must make good its contention that the policy, properly construed, contains a good health provision. That, in turn, brings us face-to-face with the application form and perhaps the premium receipt since the policy itself contains no such provision. Although the precise point was not there involved, our *Erie*-search is aided considerably by the coincidence that the Supreme Court of Texas in United Founders Life Ins. Co. v. Carey, 1963, Tex., 363 S.W.2d 236, reversing, Tex.Civ.App.1961, 347 S.W.2d 295, dealt with precisely the same form of application [5] and a receipt [6] which differed as to one sentence only.

4. Although the conduct and knowledge of Mr. Bryant, husband and principal beneficiary, is surely relevant, we intimate no conclusion under this Texas doctrine as to the beneficiary's duty to disclose. Many factors, legal and factual, need exploration especially in light of the policy provisions which gave the Assured the unqualified right to change beneficiaries and the troublesome problems of that never-never-land in which we do not now venture, cf. Commissioner v. Chase Manhattan Bank, 5 Cir., 1958, 259 F.2d 231, on the status of life insurance obtained with community funds.

5. To facilitate discussion, we have inserted bracket [a] and [b] in paragraph (1). Reference will be made to Par. (1) [a] or (1) [b].

The following immediately preceded signatures of the soliciting agent and the proposed Assured.

"It is agreed that:

"(1) [a] The Company shall incur no liability under the application until it has been received and approved, a policy has been issued and delivered, and the full first premium specified in the policy has been actually paid to and accepted by the Company while health, habits and occupation of the Proposed Insured remain as described in this application in which case the policy shall be deemed to have taken effect as of the date on which the policy was signed. [b] However, if the full first premium specified in the application on the policy applied for is paid on the date of this application and the receipt bearing the same serial number as this application is issued to the applicant, then the liability of the Company shall be as stated in the receipt.

"(2) Only the President, a Vice-President, Secretary or an Assistant Secretary of the Company can make, modify or discharge contracts or waive any of the Company's rights or requirements and then only in writing. No statement, representation or promise made by any other person shall be binding upon the Company. * * *

"(3) The Company is authorized to amend this application in the space en-

■ In this analysis we begin with the Texas proposition that a good health provision is perfectly valid, is to be enforced according to its tenor, is a matter which goes to the effectiveness of the contract and is not to be confused with the problem of misrepresentation, innocent or fraudulent, by the assured.[7] Likewise, we agree with the Insurer that the phrase "while health, habits and occupation of the Proposed Insured remain as described in this application" found in Par. (1)[a], note 5, supra, is a "good health" provision. In terms of time, the good health is referable to the delivery

of the policy, the payment of the full first premium specified in the policy and acceptance thereof by the insurer.

■ As to the state of "health," the standard is, in effect, that the assured's health is no worse than that described. But merely because the application agreement, note 5, supra, is prefaced with the statement "each of the undersigned declare that he has read the questions and answers contained herein and that the answers are complete and true to the best of his knowledge and belief * * *,"[8] this does not in a left-handed

---

titled 'Home Office Additions or Corrections' and acceptance by the applicant of any policy issued on this application shall constitute a ratification of any such amendments."

6. The receipt was attached by perforated tear line to the application form which is serially numbered in printing. The portion from * to * * is different from the Carey receipt.

" Receipt
"DO NOT DETACH UNLESS FULL FIRST PREMIUM IS PAID WITH APPLICATION.

"Received from .......... No. ......
the sum of .............. ($.......)
Dollars for the first premium specified in the application for insurance in the Standard Life and Accident Insurance Company which bears the same date and serial number as this receipt. The insurance under the policy for which application is made shall be effective on date of this receipt or the date of completion of the medical examination (if required) whichever is the later date if, in the opinion of the authorized Officers of the Company at its Home Office in Olahoma City, Oklahoma, the Proposed Insured is insurable and acceptable for insurance under its rules and practices on the plan of insurance, for the amount of insurance, and at the premium rate set forth in the application, exclusive of any amendments in the space for 'Home Office Additions or Corrections.' However, if the Proposed Insured dies prior to the Company's actual issuance and delivery of the policy applied for, the total liability of the Company under this receipt shall not exceed $100,000. If the Company declines to issue a policy, the Company shall incur no liability hereunder except to return by its check the above payment upon surrender

of this receipt, * or if a policy differing in form, amount or premium from that applied for is offered, no insurance shall be considered in effect under the application herein referred to unless and until the full first premium is paid and a policy actually delivered to and accepted by the Applicant during the continued good health of the Proposed Insured. * * This receipt shall be void if given for check or draft which is not honored on presentation.
........, 19.... ..............Agent
* * *."

7. Lincoln Income Life Ins. Co. v. Mayberry, 1960, 162 Tex. 492, 347 S.W.2d 598, 600, reversing, 341 S.W.2d 199; Southern Surety Co. v. Benton, Tex. Comm.App., 1926, 280 S.W. 551, 552; Wright v. Federal Life Ins. Co., Tex. Comm.App. judgm't adopted, 1923, 248 S.W. 325; Jackson v. Amer. Nat. Ins. Co., 1962, Tex.Civ.App., writ denied n.r.e., 362 S.W.2d 916, 917; Commercial Travelers Cas. Co. v. Biscamp, Tex.Civ.App., no writ history, 1958, 310 S.W.2d 674, 675. In Texas good health is determined as of the time prescribed in the policy and not, as under the majority rule, as a relative, comparative matter indicating a substantial change between time of application and policy delivery. 136 A.L.R. 1516; 60 A.L.R.2d 1429.

8. Similar language is used in the questions and answers given on the medical examination form and to which the Assured gave the italicized answers:
"(3) Are you now in good health, as far as you know and believe? *Yes.*
"(16) Have you at any time ever had F. cancer or other tumor, * * *? *No.*
"I hereby declare, that, to the best of my knowledge and belief the information

way bring in the assured's *knowledge*. Modifying phrases such as "to the best of" the assured's "knowledge and belief" are, of course, of great significance so far as misrepresentations or good faith are concerned. But they do not, either in point of time or medical standard, lessen the status or fact thereby represented.

The difficult problem, however, is not what Par. (1) [a], note 5, supra, of the application means. The problem is whether Par. (1) [a] has anything to do with this case. It is significant that in that sentence the reference to the premium is that "the full first premium specified in the *policy*" has been paid. This is in sharp contrast to Par. (1) [b] which is operative "if the full first premium specified in the *application*" is paid. It is perfectly evident that Par. (1) [a] is intended to apply in those situations in which an application is signed and, with or without a required medical examination, the application is submitted to the home office for acceptance after which a policy is issued with the premium being specified in the policy. This is corroborated, not alone by the language just quoted on the "premium specified in the *policy*," but by the fact that the earliest date on which the insurance becomes effective is "the date on which the policy" is signed.

Both extrinsically and intrinsically, Par. (1) [b] is in sharp contrast. First, the conjunctive "however" is very significant. When used in this manner, it denotes an opposition between the ideas it connects and expresses a mutually exclusive alternative. 41 C.J.S. p. 370; Tex. Elec. Ry. v. Neale, Tex.Civ.App. 1951, 244 S.W.2d 329, 333, reversed on other grounds, 1952, 151 Tex. 526, 252 S.W.2d 451. Intrinsically, it is evident that this is intended to outline—whether it does so effectively is quite a different question—the respective rights and duties where, at the time the application is signed, payment is then made of the first full premium specified in the appli-

cation. It undertakes to do this by prescribing that "the liability of the company shall be as stated in the receipt." There are obvious advantages to the insurer in this route, not the least being that with the payment of the first specified premium, the insurer now has a bird-in-the-hand. Perhaps out of deference to them, the receipt itself (see note 6, supra) affords substantial advantages to the applicant in terms of effective, temporary insurance pending issuance of a policy and often where no policy ever is, or may be, issued because of intervening death of the proposed assured. United Founders Life Ins. Co. v. Carey, 1963, Tex., 363 S.W.2d 236. Thus, the insurance may be effective as of the date of the receipt or the date the physical examination is completed, if required. A "good health" standard is not there prescribed, but the insurer has that protection since the earlier dates depend upon— as Carey makes clear—a good faith determination by the insurer whether the applicant is "insurable and acceptable * * * under its rules and practices" for the plan, amount, and premium prescribed in the application. The receipt also undertakes to prescribe what is to occur if, presumably after a good faith determination, it declines to issue a policy or issues one "differing in form, amount, or premium". (See the portion * to ** in the receipt, note 6, supra.) In that event the receipt prescribes that no insurance shall be effective "until the full first premium" is paid and the policy is delivered to and accepted by the assured "during the continued good health" of the assured.

The Insurer insists that even if Par. (1) [b] is an alternative to (1) [a], it did not become operative here because the "full first premium" was not paid with the application. This, the Insurer asserts, was not accomplished until the payment of the additional premium on delivery of the rated-up policies (see I, II, (h)–(j), note 1, supra). This rests, how-

given above is correctly recorded, complete and true and I agree that the com-

pany believing it to be true shall rely and act upon it accordingly."

ever, on the assertion that because of Par. (2) of the application limiting waivers, etc. to those signed by executive officers, the soliciting agent did not have the authority to prescribe the "first premium." Pursuing that further, it asserts that the "full first premium" was not authoritatively determined until the rated-up policies were delivered about January 8, 1961 (see I, II (g), note 1, supra). We reject this contention for two reasons. First, the literal language of Par. (1) [b] describes it as the "full first premium specified in the *application*". Second, in referring expressly to the receipt, the application necessarily incorporated that portion of the receipt where it was to be signed on behalf of the Insurer by one described as "Agent." Its agent was expressly authorized to execute the receipt. For these purposes it had to trust in the agent's understanding of the premium tables. It protected itself further by requiring the receipt to bear the same "serial number" as the application.

The fact is, therefore, clearly established that the applications for each of these policies was under Par. (1) [b]. The premium was specified by the authorized agent and that premium in the amount specified was paid at the time of the application. (Items I, II, (c), (d), (e), note 1, supra). It is equally clear that what the company did thereafter, it did pursuant to the terms of the receipt [9] and not in accordance with any privilege accorded it under Par. (1) [a] of the application. Indeed, the policy dated December 19, 1960, delivered about January 8 (Items I, II, (f), (g), note 1 supra), came within the literal language of the receipt as "a policy differing in form, amount, or premium from that applied for." [10]

Of course this part of the receipt contained a very plain, unambiguous, positive good health provision. It spoke in those very terms. But this provision was not a part of the policy. Neither was it a part of the application as attached to the policy. What it was, was a paper referred to by the application, but that is not enough. The Texas requirement is plainly revealed in Art. 21.24 (note 3, supra). For us the course is clear. Texas Courts have held that unless the receipt is attached to the policy, it cannot be considered as a part of the insurance contract.[11] Incorporation by reference will not do the job.[12]

Since the application upon which the policies were issued was not under Par. (1) [a], the Insurer cannot look to the good health clause in that paragraph. Nor can it look to the good health clause incorporated by reference to the receipt in Par. (1) [b].[13] That leaves, then, only Par. (3) of the application, note 5, supra, as a possible source. This clause authorizes the Insurer to amend the application, and it provides that acceptance by the applicant of the policy "shall constitute a ratification of any such amendments." Here the Assured through authorized agents deliberately accepted each policy, one on Jan-

9. Although suit was not on the insurance provided by the receipt (as in Carey), it was obviously relevant and was therefore admissible in evidence.

10. See portion marked * to **, note 6, supra.

11. See Schodts v. American Hospital & Life Ins. Co., Tex.Civ.App., writ refused n.r.e., 1958, 313 S.W.2d 946. See also Jefferson Standard Life Ins. Co. v. Baker, Tex.Civ.App., 1924, 260 S.W. 223; Scott v. National Bankers Life Ins. Co., Tex. Civ.App., 1952, 253 S.W.2d 485.

12. Illinois Bankers Life Assn. of Monmouth, Ill. v. Talley, 5 Cir., 1934, 68 F. 2d 4; Smith v. Rio Grande Natl. Life Ins. Co., Tex.Civ.App., error ref'd, 1950, 227 S.W.2d 579; The Praetorian v. Thompson, Tex.Civ.App., 1935, 79 S.W.2d 886; First Tex. Prudential Ins. Co. v. Pedigo, Tex.Civ.App., 1930, 31 S.W.2d 854, reversed on other grounds, Comm.App., 1932, 50 S.W.2d 1091; National Livestock Ins. Co. v. Gomillion, Tex.Civ.App., 1915, 178 S.W. 1050, rehearing denied, 179 S. W. 671, error refused.

13. The Insurer is correct in asserting that once the policy is issued and accepted (as it was here), the receipt has no further function. But that is unavailing since in the absence of the receipt there is no good health provision.

uary 8, 1961, the other on January 30 at which time the additional premiums were paid (Items I, II, (g) (h), (j), note 1, supra). More than that, the beneficiaries vigorously insist that each suit is based on the policy, not the application. This means that each beneficiary has not only impliedly but expressly ratified the amendments and seeks the fruits thereof. But the "home office additions or corrections" referred to in Par. (3) are here limited in nature.[14] The Home Office amendment did not expressly prescribe a standard of "good health." Par. (3) contained no good health provision. The Home Office additions contained none.

██ Actually Par. (3) fits into applications made under (1) [a] or (1) [b]. Acceptance of the amendments, of course, affects whatever type of application— (1) [a] or (1) [b]—was made. But acceptance does not transmute a (1) [a] into a (1) [b] or vice versa. Here the application amended pursuant to Par. (3) was not under Par. (1) [a] so the good health provision of that sentence could not be availed of. The amendment was to an application under · Par. (1) [b] which had, in effect, an unenforceable good health provision since it was contained in a receipt not attached to the policy.

██ The acceptance of the amendments by the Assured and ratification thereof by these beneficiary-plaintiffs is nothing more than the assertion by them that under the peculiar wording of the application and the ineffectual receipt, the policy as offered was one which contained no good health provision. They were, quite naturally, willing to accept that and pay the added premium prescribed by the Home Office amendments. If, as asserted by the Insurer, the rated-up policy was a counter offer, then it was a counter offer made pursuant to Par. (1) [b] of a policy having no good health

provision either in its terms or by permissible incorporation.

The Insurer insists this is a harsh result. If so, it is due directly to mandatory statutory standards of Texas given full voice by its courts and binding on us. The policy has been reflected by precise statutes for nearly half a century. It is a policy easily complied with. The terms of the receipt (note 6, supra) need only be physically incorporated on or with the same paper forming the application so that, in accordance with Art. 21.35 a reproduced copy of the entire application will accompany the policy. The Insurer is right, there is hardly anything as important as a good health provision. Being that important both for the Assured and Insurer, for it to be enforceable it has to be either in the policy or in the application attached to the policy. The whole notion of Texas to wrap up everything in one single contract with its attachment is defeated if the parties have to search here and there for the standard of compliance, the measure of rights and the basis for liability.

 The result is that the District Court was in error in holding that there was a good health provision in this policy under these circumstances. That does leave open on the remand the alternative Texas principle discussed above that requires disclosure of known significant facts bearing upon probable insurability occurring between application and delivery. As our decision authoritatively determines for the first time the construction of the policy—applications, in the interest of justice, Gulf Oil Corp. v. Wright, 5 Cir., 1956, 236 F.2d 46, the Insurer is also free on remand to assert whatever other defenses it may have, including, if available, that of misrepresentation, fraudulent or otherwise. As we have so many times and recently said,

14. Part I of the application has a blank headed: "Home Office Additions or Corrections—do not write in this space." In the Bryant policy, there was stamped and handwritten in:

"Reg. [ular] M. [Monthly] Prem. [ium]
$199.24
Rated Table 2(B)."
In the McCarley policy, similar entries were made, the premium being fixed at $71.93.

Vandercook & Son, Inc. v. Thorpe, 5 Cir., 1965, 344 F.2d 930; Duke v. Sun Oil Co., 5 Cir., 1963, 320 F.2d 853, 865, we intimate no opinion as to the factual or legal holdings required or permitted on the evidence contained in that record, not this one.

Reversed and remanded.