**The FORSCHNER GROUP, INC., and Swiss Army Brands, Ltd., Plaintiffs,**

v.

**ARROW TRADING CO., INC., Defendant.**

**No. 92 Civ. 6953 (LAP).**

United States District Court, S.D. New York.

Sept. 29, 1993.

---

Nims, Howes, Collison, Hansen & Lackert, New York City by Oliver P. Howes, Jr., Karen P. Clancy, for plaintiffs.

Cowan, Liebowitz & Latman, P.C., New York City by Louis S. Ederer, Paul R. Levenson, for defendant.

## OPINION and ORDER

PRESKA, District Judge.

Plaintiffs, The Forschner Group, Inc., and its subsidiary Swiss Army Brands, Ltd. (collectively "Forschner"), bring this action against Arrow Trading Co., Inc. ("Arrow"), for violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), and for unfair competition under New York common law. Forschner, a distributor of Swiss Army knives in the United States, seeks to enjoin Arrow from advertising or promoting knives made in China in a manner which falsely represents them to be Swiss Army knives. This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. BACKGROUND

### A. *Victorinox and Wenger*

In 1891, Karl Elsener, a German-speaking Swiss, began producing a pocketknife containing multiple utensils. The Swiss military, which previously had purchased knives made in Germany, started purchasing its knives from Elsener. Since 1921, Elsener's company has been called Victorinox[1]—a combination of the name of Elsener's mother, Victoria, and the international trade name for stainless steel, Inox.

In 1908, Theodore Wenger, a French-speaking Swiss, began producing a multi-function pocketknife, and the Swiss military started purchasing half of its knives from Wenger[2] and half from Victorinox. This nonpartisan split of the Swiss military's purchases between Victorinox (of German-speaking Ibach–Schwyz) and Wenger (of French-speaking Delemont) persists today. Although Victorinox and Wenger produce a panoply of pocketknives, the Swiss military purchases only a relatively basic model and only from Victorinox and Wenger.

Familiarity with the knives grew in the United States upon the return of American soldiers from Europe after World War II; the soldiers had become acquainted with the knives in Switzerland and originated the term "Swiss Army knife." Today, Swiss Army knives manufactured by Victorinox are distributed in the United States by Forschner; Forschner has continuously imported Swiss Army knives from Victorinox since 1950. Precise Imports Corporation ("Precise"), which is not a party to this litigation, imports Swiss Army knives from Wenger for distribution in the United States.

Most of the Swiss Army knives distributed by Forschner are red and bear a cross-and-shield symbol on one side. The tang of the main blade of a Swiss Army knife distributed by Forschner is marked:

VICTORINOX

SWITZERLAND

STAINLESS

ROSTFREI

### B. *The Chinese Knife*

In or about January 1992, Arrow began selling a red pocketknife containing multiple utensils (the "Chinese knife"). The Chinese knife is made in China and sold by Arrow to customers who use it either for mail order sales or as a premium. By the latter, it is meant that Arrow's customer uses the Chinese knife as an incentive in the sales promotion of its own product.

Embossed on one side of the Chinese knife are the words "SWISS ARMY," above which is a cross-and-shield design; a very small "TM" is located between the letter "M" in "SWISS ARMY" and the cross-and-shield design. The cross-and-shield design found on the Chinese knife is distinguishable from that on a Swiss Army knife distributed by Forschner, and each of those designs is distinguishable from that on a Swiss Army knife

---

1. The current complete name of the company is Victorinox Cutlery Company.

2. The current complete name of the company is Wenger S.A.

distributed by Precise. The tang of the main blade of the Chinese knife is marked:

STAINLESS

CHINA

Arrow distributes the Chinese knife in a rectangular box which, on the top, displays the words "SWISS ARMY" with the cross-and-shield design, as embossed on the Chinese knife, next to the words, in large letters:

11 FUNCTION

SWISS ARMY KNIFE

A side of the box states, in letters smaller than those on the top of the box, "THE SWISS ARMY LOGO DESIGN IS A TRADEMARK USED UNDER LICENSE BY ARROW TRADING CO. INC. NEW YORK, N.Y. 10010, USA." Below this, the box states the model number for the Chinese knife and "Made in China."

With the small "TM" found on the Chinese knife and the statement on the side of the box regarding "THE SWISS ARMY LOGO DESIGN," Arrow seeks to reflect a licensing agreement it claims to hold with Colony Corporation ("Colony") regarding the cross-and-shield design and not any use of the words "SWISS ARMY." Colony has a pending trademark application for the cross-and-shield design, and Colony and Arrow—which are sister corporations, as phrased by the president of Arrow and Colony, Jack Dweck—have a related licensing agreement, which Mr. Dweck testified to be unwritten.

### C. *Comparative Quality*

Deep contrasts can be drawn upon the physical examination of the Chinese knife and a Swiss Army knife distributed by Forschner. A Swiss Army knife distributed by Forschner is without doubt a precision instrument. Because the utensils are firmly hinged in the handle, the knife is very sturdy even when the utensils are open. In contrast, when one applies pressure to the open utensils on the Chinese knife, the utensils move laterally; this results in a conspicuously unsteady knife. The solid construction of a Swiss Army knife distributed by Forschner is also apparent when closing utensils; the utensils veritably snap shut creating a single solid unit. Utensils on the Chinese knife are prone to require aid in returning to a fully closed position, and the utensils are not secured well when finally closed.

Other flaws in the Chinese knife exist. For example, the scissors do not work well; the two blades of the scissors are not well-connected, and paper has a way of sliding between the blades without getting cut. The main blade of the Chinese knife is critically dull. In contrast, the scissors on a Swiss Army knife distributed by Forschner work well, and cutting blades on all utensils are severely sharp.

Arrow does not dispute that the Chinese knife fails to meet the standard of high quality found in a Swiss Army knife distributed by Forschner. According to Mr. Dweck, the Chinese knife is "an attractive functional product.... It's not a Rolls Royce. It's a Honda Accord." In the opinion of the undersigned, a Swiss Army knife distributed by Forschner is a Rolls Royce, but the Chinese knife is a Yugo. Similar contrasts in quality are discernible between the Chinese knife and a Swiss Army knife distributed by Precise.

## II. DISCUSSION

This action involves only a small slice of the law of unfair competition. The existence of a trademark is not at issue; Forschner concedes that "Swiss Army knife" is not a trademark and does not seek exclusive use of the term "Swiss Army knife." Rather, Forschner sues to enjoin the representation of the Chinese knife as a Swiss Army knife because that representation misleads the public as to the geographic origin and the quality of the Chinese knife. For this reason, the action may be best classified as falling within the law of unfair competition or false advertising and not trademarks.

Precedent exists for the issuance of injunctive relief under section 43(a) of the Lanham Act in order to protect a geographical designation. *E.g.*, *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746 (8th Cir.1980) (affirming injunction of "Black Hills Gold" or "Black Hills Gold Jewelry" label on products not manufactured in the Black Hills of South Dakota); *Scotch Whiskey Ass'n v. Barton*

*Distilling Co.*, 489 F.2d 809 (7th Cir.1973) (affirming injunction of "Scotch whiskey" label on product not originating in Scotland); *Scotch Whiskey Ass'n v. Consolidated Distilled Prods., Inc.*, 210 U.S.P.Q. 639, 1981 WL 40524 (N.D.Ill.1981) (enjoining use of "Loch–A–Moor" mark in connection with whiskey not produced in Scotland). *See generally* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 14:9 (2d ed. 1984). This action fits squarely within this narrow branch of the law.

Forschner asserts the straightforward claim that Arrow's representation of the Chinese knife as a Swiss Army knife, chiefly through Arrow's use of the words "SWISS ARMY" and the cross-and-shield design, misleads consumers into believing that the Chinese knife is from Switzerland and of high quality. As already discussed, the Chinese knife is made in China, not Switzerland, and is not of high quality or of any quality approaching that of a Swiss Army knife distributed by Forschner or Precise.[3]

### A. *"Swiss Army knife"*

The essential dispute between the parties concerns the significance of Arrow's designation of the Chinese knife as a Swiss Army knife. Arrow's representation of the Chinese knife as a Swiss Army knife appears foremost through Arrow's use of the words "SWISS ARMY" and the cross-and-shield design; in effect, this action turns upon whether Arrow's employment of "SWISS ARMY" and the cross-and-shield design misleads consumers into believing that the Chinese knife is made in Switzerland and of high quality.

The parties point to diverse evidence regarding the significance to consumers of the words "SWISS ARMY" and the cross-and-shield design. The Court finds the survey evidence presented by Forschner to be most telling but will also review additional evidence introduced at trial which places Forschner's survey in context.

1. *History and Reputation.* As already observed, pocketknives with multiple utensils manufactured in Switzerland by Victorinox and Wenger have an engrossing history of over one century. Throughout this period, the knives appear to have had a reputation for high quality; the Swiss military's purchase of the knives has been a continuous boost to their stature. This well-honed reputation seems to have been captured in the United States by the term "Swiss Army knife" when the knives gained renown upon the return of American soldiers from World War II.

2. *Advertising.* The Court has reviewed extensive evidence of Forschner's considerable advertising and promotional efforts for Swiss Army knives manufactured by Victorinox. Two points are of special note. First, Forschner uses not only the term "Swiss Army knife" in connection with the sale of the knives but also the term "The Original Swiss Army Knife;" Precise, in comparison, uses the term "The Genuine Swiss Army Knife" in selling Swiss Army knives manufactured by Wenger. This differentiation between "Original" and "Genuine" derives from the settlement of a legal action between Forschner and Precise, but the labels are informative nevertheless. Forschner and Precise have propagated the "Swiss Army knife" term in connection with their high quality multi-function pocketknives of Swiss manufacture and, by calling the Swiss Army knives "Original" and "Genuine," have enforced the association between the knives, on the one hand, and Victorinox and Wenger and their distinctive histories and prominent reputations, on the other hand.

Second, Forschner has undertaken extensive policing efforts in the United States to stop the use of the term "Swiss Army knife" in connection with pocketknives not manufactured by Victorinox or Wenger. Remarkably, Forschner demonstrated during trial that it had sent "cease and desist" letters in response to each instance identified by Arrow of the use of the "Swiss Army knife"

---

**3.** Forschner asserts that Arrow misstates both the geographic origin and the quality of the Chinese knife. Although the Court understands the issue of quality to be intertwined with that of geographic origin, *i.e.*, consumers care about

geographic origin in part because of inferences made therefrom as to quality, Forschner has submitted evidence to support its arguments as to consumer perception of geographic origin and of quality when evaluated independently.

term in connection with the sale of a pocket-knife not manufactured by Victorinox or Wenger. Consequently, the Court is aware of no advertisements which currently employ the "Swiss Army knife" term in connection with pocketknives—except for pocketknives manufactured by Victorinox and Wenger.

3. *The "Myth" Factor.* The pocketknives manufactured by Victorinox and Wenger have taken on the qualities of legend, albeit less regal than Excalibur. The history of the knives has been recounted in numerous articles. Various entertaining tales also gush forth. For example, Swiss Army knives were originally colored red so that they could be spotted in snow. A Victorinox Swiss Army knife sits in New York's Museum of Modern Art. Swiss Army knives travel into space with astronauts, and the White House has given them as gifts since Lyndon B. Johnson was president.

When reviewing various anecdotes about Swiss Army knives, it is not always possible to discern whether in fact a knife manufactured by Victorinox or Wenger is concerned. However, significant celebrity is attributed explicitly to Swiss Army knives manufactured by Victorinox and Wenger, and one can surmise that most, if not all, of the stories exalting Swiss Army knives without identifying a manufacturer tacitly speak to Victorinox or Wenger. Regardless of whether Victorinox or Wenger is acknowledged, however, the Court finds the submissions and testimony to reflect a clear association between the term "Swiss Army knife" and knives of high quality manufactured in Switzerland.

4. *Forschner's Survey.* Dr. Joel B. Cohen, Distinguished Service Professor of Marketing, Adjunct Professor of Anthropology, and Director of the University of Florida's Center for Consumer Research, developed Forschner's study which tested consumer perception of the quality and geographic origin of the Chinese knife. The focus of Forschner's survey thereby meshed strikingly well with Forschner's claim that Arrow's representation of the Chinese knife as a Swiss Army knife misleads the public into believing that the Chinese knife is of high quality and made in Switzerland.

The study utilized 380 respondents who were found in five major United States cities, approximated the age and gender makeup of Americans aged at least sixteen years, and were screened to assure that they were potential purchasers of a multi-function knife. The respondents were presented with a picture of the Chinese knife, brandishing the side bearing the words "SWISS ARMY" and the cross-and-shield design, shown next to a short description of the Chinese knife (the "survey catalogue page").[4]

Respondents were presented with the survey catalogue page and asked a series of questions. In brief, the survey inquired if there was anything about the Chinese knife as shown on the survey catalogue page that led the respondent to believe that it was manufactured to be of high quality ("Question 1"). On receipt of an affirmative answer to Question 1, the respondent was asked what led him or her to that belief ("Question 2"). In addition, the survey asked if there

4. The description in the survey catalogue page lists the model number of the Chinese knife and, in large letters, "11–FUNCTION SWISS ARMY KNIFE," followed by a brief tally, in italicized letters, of the utensils:

The Pocket Survivor. 1 each: scissors, corkscrew, bottle and can openers, hunting and carving blades, phillips and flat head screwdriver head, toothpick, tweezers, scaling blade, nail file. Stainless steel. 3½" long.

This description was modeled after a page in an Arrow catalogue which contains a similar description and picture of a knife along with descriptions and pictures of six other knives. The description of the comparable knife in Arrow's catalogue differs from that in the survey catalogue page: the model number is slightly different and is followed by, in bold letters, "14–Function Swiss Style Army Knife." The picture of the comparable knife in Arrow's catalogue differs only in that no embossed material, *i.e.*, the words "SWISS ARMY" and the cross-and-shield design, appears. Testimony before the Court indicated that the knife shown in Arrow's catalogue could be the Chinese knife with the side containing embossed material facing away from the camera or it could be a different knife sold by Arrow which does not bear any embossed material. In any case, the knife shown in Arrow's catalogue resembles the Chinese knife with the side bearing the embossed cross-and-shield design and the words "SWISS ARMY" facing away from the camera.

A copy of the survey catalogue page is annexed to this Opinion as Appendix A.

was anything about the Chinese knife as shown on the survey catalogue page that led the respondent to believe that the Chinese knife was manufactured in any particular place ("Question 3"). On receipt of an affirmative answer to Question 3, the respondent was asked where he or she believed the Chinese knife was manufactured ("Question 4").

Of the total respondents, 34 percent both answered Question One affirmatively and, in response to Question Two, noted in some form either the words "SWISS ARMY" or the cross-and-shield design on the Chinese knife. An additional 11 percent made some reference (1) to an unspecified but well-known or respected manufacturer or to a special endorsement of the Chinese knife or (2) to the same or a similar high quality knife or to a similar knife which they had owned or used. Dr. Cohen makes a forceful case that the 11 percent can be added to the 34 percent in order to derive a category of 43 percent of the respondents [5] who were led to believe that the Chinese knife was manufactured to be of high quality because of an association made by those respondents with the term "Swiss Army knife." Essentially, the 11 percent is included because, although these respondents did not verbalize a connection between the Chinese knife and the words "SWISS ARMY" or the cross-and-shield design, they do appear to have identified the Chinese knife with a Swiss Army knife, *i.e.*, their response indicated that they had in mind a Swiss Army knife manufactured by Victorinox or Wenger.

As to place of manufacture, 38 percent of the total respondents both answered Question Three affirmatively and, in response to Question Four, stated that they believed that the Chinese knife was manufactured in Switzerland. Interestingly, an additional 3 percent reacted to Question 4 by stating "Swiss Army knife" or "Swiss Army."

5. *Conclusion.* In large part in reliance upon Forschner's survey and the credible and highly persuasive testimony of Dr. Cohen, the Court finds that consumers perceive

the Chinese knife to be of high quality and produced in Switzerland because Arrow represents it to be a Swiss Army knife through the use of the words "SWISS ARMY" and the cross-and-shield design. Forschner has proven that 43 percent of the relevant public are led by Arrow to believe that the Chinese knife is manufactured to be of high quality and that 41 percent of the relevant public are led to believe that the Chinese knife is manufactured in Switzerland. Relief has been granted on the basis of more modest figures demonstrating consumer confusion as to geographic origin. *See Consolidated Distilled,* 210 U.S.P.Q. at 641–44. Analogizing the standard applicable where a trademark is at issue, the Court finds a " 'likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused' " as to the geographic origin and quality of the Chinese knife. *Plus Prods. v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1003 (2d Cir.1983) (citations omitted).

Consideration of the survey results in the context of the history of Swiss Army knives enriches this analysis. Public perception of Swiss Army knives manufactured by Victorinox and Wenger has its genesis with the influx of the knives into the United States after World War II. At that time, the connection became fixed in the American mind between the knives—for the first time called Swiss Army knives—and their Swiss origin and high quality. As the decades passed, extensive advertising campaigns impressed upon the public the Swiss origin and high quality of the knives; policing efforts by Forschner and Precise assured that the public was exposed only to Swiss Army knives manufactured by Victorinox and Wenger. As the aura of celebrity surrounding Swiss Army knives continued and grew in the media, the public perception of Swiss Army knives as Swiss-made products of high quality became even more firmly ingrained. From this course of events, we arrive at a state of affairs where the label "SWISS ARMY" and a cross-and-shield design on a

---

5. Because of overlapping responses, 2 percent of the sum of 11 percent and 34 percent is not counted.

pocketknife cause a significant portion of the public to believe the knife to be of high quality and made in Switzerland.

Because both the words "SWISS ARMY" and the cross-and-shield design are found both on the Chinese knife and on the box containing the Chinese knife, the Court need not distinguish the representations made by Arrow either between the Chinese knife itself and the box or between the words "SWISS ARMY" and the cross-and-shield design. On the basis of an examination of these items, Forschner's survey and the accompanying testimony of Dr. Cohen, the history of Swiss Army knives, and the balance of the evidence admitted at trial, the Court finds that the Chinese knife, whether considered alone or in its box, is perceived by the purchasing public to be a Swiss Army knife—a high-quality, Swiss-made product—which it is not.[6]

### B. *Genericness*

As stated above, the Court finds that Arrow's representation of the Chinese knife as a Swiss Army knife misleads consumers as to the geographic origin and the quality of the Chinese knife. Arrow, rather than focusing upon these issues, has directed its energies in an attempt to prove that "Swiss Army knife" is a generic term denoting any multi-function pocketknife.

With this approach, Arrow seems to have lost the forest from the trees. Forschner contends that Arrow deceives the public into believing that the Chinese knife is made in Switzerland and of high quality; Forschner's survey and Dr. Cohen's testimony proved

this claim in high fashion. Arrow's retort, which asserts that the public considers the term "Swiss Army knife" to be more descriptive of product type than geographic origin, is unduly preoccupied with proving genericness and entirely fails to refute Forschner's argument that designation of the Chinese knife as a Swiss Army knife misleads the public.

In evaluating this case as a debate about genericness, Arrow rivets itself to the notion that "Swiss Army knife" cannot receive trademark protection if it is a generic term. *See generally Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976); Charles E. McKenney & George F. Long, III, *Federal Unfair Competition: Lanham Act § 43(a)* § 3.03 (1989); McCarthy §§ 12:1, 14:8. However, Forschner does not seek trademark protection in this action but attempts to stop Arrow from misrepresenting the Chinese knife as a Swiss Army knife—a high-quality, Swiss-made product. Accordingly, Arrow's argument about genericness, at best, seeks to demonstrate that consumers are not confused or misled as to the Chinese knife's quality and geographic origin because they perceive the term "Swiss Army knife" to be merely an indication of a multi-function knife. This roundabout theory simply fails to confront the evidence of consumer confusion presented by Forschner. The survey prepared by Arrow for this action epitomizes the problems in Arrow's thinking.

1. *Arrow's Survey.* Edward Epstein of Edward Epstein & Associates, Inc., a marketing research firm, designed Arrow's sur-

---

**6.** Insofar as Forschner has pointed to Arrow's catalogue as making misrepresentations about the Chinese knife, it is not clear that the catalogue in fact touts the Chinese knife—as opposed to a similar knife without the embossed "SWISS ARMY" and cross-and-shield design. As a result, the Court does not rely upon the catalog. If the catalog does promote the Chinese knife, the findings regarding the Chinese knife itself and the box containing it are independently sufficient to sustain the Court's ruling. If a knife other than the Chinese knife is presented in the catalog, then any representations made by Arrow in the catalog are immaterial to this decision. Accordingly, the Court declines to address whether Arrow's use of the term "Swiss Style Army Knife"

is sufficient to merit relief when considered alone.

In addition, insofar as Forschner alleges that the phrase "THE SWISS ARMY LOGO DESIGN IS A TRADEMARK USED UNDER LICENSE BY ARROW TRADING CO. INC. NEW YORK, N.Y. 10010, USA." represents that Arrow's knife is sold with the approval of Forschner or Precise, the Court finds an absence of sufficient support for this claim in the evidence. Forschner's argument on this point seems to beg too great a level of sophistication from potential purchasers. Similarly, the Court does not find adequate support in the evidence for Forschner's argument that consumers believe that Swiss Army knives are distributed by a purveyor to the Swiss military.

vey. The survey utilized 201 respondents, and, as in Forschner's survey, respondents were at least sixteen years old and from across the United States; in contrast to Forschner's survey, three-fourths of Arrow's respondents were men. Respondents were screened so that they either owned a pocketknife, had bought a pocketknife in the past two years, or thought that they would buy a pocketknife in the next two years. Interviews were conducted by telephone.

Essentially, seven items having a geographic term as part of their names were read to respondents: French horn, California raisins, Idaho potatoes, Swiss Army knife, Bermuda shorts, English muffins, and Florida oranges. Respondents were asked for each item whether the geographic term was primarily a reference to the type of product or primarily a reference to where the product comes from. Of the total 201 respondents, 39 percent indicated that the "Swiss" in "Swiss Army knife" primarily refers to where the product comes from.[7]

From the start, two conspicuous problems pierce through Arrow's survey when appraised in the context of Forschner's claim. First, Arrow's survey did not deal at all with public perception of the quality of Swiss Army knives. As already noted, Forschner in effect has a two-prong claim; Arrow's representation of the Chinese knife as a Swiss Army knife misleads the public as to both origin and quality. Arrow's survey therefore completely overlooks half of Forschner's claim. Second, as to the half of Forschner's claim which Arrow's survey does pertain, the survey bolsters Forschner's argument that the public perceives Swiss Army knives to originate in Switzerland. To repeat, 39 percent of the respondents in Arrow's survey indicated that the "Swiss" in "Swiss Army knife" primarily refers to where the product comes from.

These glaring problems have not daunted Arrow; Arrow has continuously ignored the substance of Forschner's claim while focusing upon its theory that "Swiss Army knife" is a generic term referring to a multi-function pocketknife.[8] The Court finds it difficult to proceed to review Arrow's survey on any terms given that the survey sustains Forschner's claim by showing 39 percent of the respondents to have stated in effect that Swiss Army knives come from Switzerland. In view of Arrow's extensive reliance upon the survey, however, the Court will briefly review the merits of the survey and the accompanying testimony further.[9]

■ 2. *Manner of Questioning.* Arrow's survey confronted respondents with the limited option of stating that the word "Swiss" in "Swiss Army knife" either is primarily a reference to a type of product or is primarily a reference to where a product comes from. This manner of closed-ended questioning foreclosed respondents from indicating that "Swiss" refers to an equal extent to a type of

7. The complete results (as percentages) were as follows:

|  | Where Product Comes From | Type of Product | Don't Know |
|---|---|---|---|
| Florida oranges | 92 | 7 | 1 |
| Idaho potatoes | 89 | 10 | 1 |
| California raisins | 84 | 11 | 5 |
| Swiss Army knife | 39 | 51 | 10 |
| English muffins | 28 | 63 | 9 |
| French horn | 25 | 61 | 14 |
| Bermuda shorts | 20 | 67 | 13 |

8. Arrow's survey resembles that referred to in a decision cited by Arrow, *Windsurfer Int'l Inc. v. Fred Ostermann, GmbH,* 613 F.Supp. 933 (S.D.N.Y.1985), *vacated,* 828 F.2d 755 (Fed.Cir. 1987). However, *Windsurfer* concerned the cancellation of certain trademarks because the term "windsurfer" had become generic; this action is *dissimilar because it does not deal with* trademark rights in "Swiss Army knife."

9. Dr. Benny Barak, Chair and Associate Professor of Hofstra University's Department of Mar-

keting and International Business, conducted statistical analyses of Arrow's survey. Despite the formidable intelligence and statistical rigor Dr. Barak brought to Arrow's survey, the Court finds the problems in Arrow's survey to be insurmountable. Simply, Dr. Barak's statistical analyses from their inception were fatally handicapped by the input, Arrow's survey.

product and to its origin. In addition, Arrow's survey completely ignored the extent to which a respondent believed "Swiss" to refer to where Swiss Army knives come from if, to any greater extent, the respondent believed "Swiss" to refer to a type of product. The Court gives great credence to the testimony of Dr. Cohen that Arrow's closed-ended questioning violated proper survey research procedure because it did not allow a respondent to give his or her best answer to a question. A proper methodology would have utilized open-ended questions, such as in Forschner's survey. *See Consolidated Distilled,* 210 U.S.P.Q. at 641 (utilizing questions similar to those in Forschner's survey).

Furthermore, the type-of-product/where-a-product-comes-from option seems to have confused respondents and produced clouded results. For example, the Court looks with substantial skepticism upon the finding of Arrow's survey that 28 percent of the respondents believed English muffins to come from England; this result raises the question of whether respondents equated the issue of "where a product comes from" with "where a product is produced." Obviously, if respondents did not equate the two, Arrow's survey is defective because it purports to address whether consumers perceive the term "Swiss Army knife" to denote geographic origin.

■ 3. *Proper Screening.* Forschner's claim relies upon the proposition that the public perceives Swiss Army knives to be Swiss-made, high quality products. To be more precise, Forschner alleges that potential purchasers of a multi-function pocketknife might purchase the Chinese knife because Arrow has confused or deceived them into believing that it is a Swiss Army knife—

a high quality product of Swiss manufacture. Accordingly, the pertinent portion of the public to be considered in a survey are persons who might purchase a pocketknife with multiple utensils; the designation of the Chinese knife as a Swiss Army knife may influence these people.

Consequently, the Court finds that Forschner's survey correctly sought out as respondents potential purchasers of a multi-function knife. Arrow's survey, in contrast, erroneously included people who owned a pocketknife or had bought a pocketknife in the past two years. Again, crediting Dr. Cohen's testimony, the Court finds that these people simply are not the relevant public. As a result, the Court recognizes that the only results of Arrow's survey to be given weight in this action arise out of the 63 respondents who thought that they would buy a pocketknife in the next two years. As Forschner points out, 43 percent of these respondents indicated that the term "Swiss" refers to where a "Swiss Army knife" comes from.[10]

To the extent that Arrow's customers themselves distribute the Chinese knife by mail order or as a premium, the Court perceives no need to make a distinction as to the identity of potential purchasers. Persons who may be deceived by Arrow's representation of the Chinese knife as a Swiss Army knife include Arrow's mail order and premium customers and members of the public who obtain the Chinese knife from them; notably, Forschner also distributes Swiss Army knives to each of these types of customers. Furthermore, neither party has submitted evidence that Arrow's customers in the mail order and premium business per-

---

**10.** Mr. Epstein testified that he purposefully screened to include respondents who owned a pocketknife or had bought a pocketknife in the past two years because such ownership or prior purchase indicated to him that the respondent would make a future purchase despite the respondent's statement that he or she would not buy a pocketknife in the next two years. Arrow has not presented any evidence other than Mr. Epstein's bold assertion to support this non-intuitive contention. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 118 (2d Cir.1984) (improper universe included former purchasers); *American Footwear Corp. v. General Footwear Co. Ltd.,* 609 F.2d 655, 661 n. 4 (2d

Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

The Court notes that respondents in the survey at issue in *Consolidated Distilled* were screened for the use or consumption of an after-dinner liqueur within the past year. 210 U.S.P.Q. at 641. The likelihood of repeated purchase of after-dinner liqueurs, in contrast to the likelihood of repeated purchase of pocketknives, makes any analogy as to the propriety of the sample universe in the two cases fail. In other words, while prior purchase of a liqueur may indicate the likelihood of a future purchase, the Court has no reason to believe that to be the case in regard to pocketknives.

ceive the Chinese knife any differently than does the general public.

4. *Word Associations.* Arrow contends that its survey placed the term "Swiss Army knife" on a continuum of product names containing geographic terms. According to Arrow, the position of "Swiss Army knife" on the continuum demonstrates that it is a generic term. In brief, Arrow separates the products in its survey into two groups according to the number of respondents who stated that the geographic term in the product's name indicated geographic origin; one group is Florida oranges (92 percent), Idaho potatoes (89 percent), and California raisins (84 percent), and the other group is English muffins (28 percent), French horn (25 percent), and Bermuda shorts (20 percent). Arrow then places Swiss Army knife (39 percent) in the latter group and asserts that the names of the products in the group are generic terms.

Arrow's argument is unconvincing. The survey contains an eclectic array of items with absolutely no connection to Swiss Army knives except for the existence of a geographic term in their names. Mr. Epstein testified that he included the items other than Swiss Army knives in the survey merely on the basis of their having a geographic term in their names. The Court discerns no justification to draw conclusions about Swiss Army knives from survey results regarding disparate items.

Furthermore, the items which Arrow recognizes to have non-generic names are all agricultural products. Mr. Epstein rationalized this anomaly by stating that the survey demonstrates that people believe that only agricultural products come from a single source. The Court considers that broad conclusion to be unsupported. To the extent that agricultural products are set apart in the survey results, the Court concludes that the agricultural products should not have been included in the survey at all because they are so distinct from Swiss Army knives. In fact, once one prunes the agricultural products from the survey, Swiss Army knives do not seem nearly as related to the grouping of items which Arrow considers to have generic names.

The Court also notes that Arrow's survey inquired as to the geographic term "Swiss." The Court finds such dissection of the term "Swiss Army knife" to make the survey substantially immaterial to both Forschner's claim and Arrow's own argument regarding genericness.

█ 5. *Non–Survey Evidence.* Setting aside Arrow's survey and looking to the balance of Arrow's case, Arrow still has failed to demonstrate that "Swiss Army knife" is a generic term. Arrow cannot point to the designation as a Swiss Army knife of any multi-function pocketknife which is not of high quality and manufactured in Switzerland; as already noted, the only instances offered by Arrow concerned distributors which Forschner had already pursued in its policing efforts. *See Black Hills,* 633 F.2d at 751–52; *Community of Roquefort v. William Faehndrich, Inc.,* 198 F.Supp. 291, 293 (S.D.N.Y.1961), *aff'd,* 303 F.2d 494 (2d Cir. 1962).

As to the references to "Swiss Army knife" identified by Arrow in connection with products other than knives, *e.g.,* advertisements comparing multifaceted investment opportunities to Swiss Army knives, the Court views these as instances of analogy and metaphor. In fact, the references sometimes draw explicit connections with Swiss Army knives manufactured by Victorinox either by noting Victorinox by name or by displaying a photograph of a Swiss Army knife produced by Victorinox.

*C. Damage to Forschner*

█ In order to receive injunctive relief, Forschner must prove that it is likely to be damaged by Arrow's misrepresentation of the Chinese knife as a Swiss Army knife. *See Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186 (2d Cir.1980). Forschner has met that burden.

In addition to the examination already reviewed, Forschner's survey asked respondents whether, assuming that they wanted to buy the knife shown on the survey catalogue page and that it was manufactured both in China and in Switzerland, they would prefer the knife manufactured in Switzerland or in

China or would the country of manufacture not matter to them. Of the total respondents, 54 percent answered that they would prefer the knife manufactured in Switzerland. Once again, the Court finds Forschner's survey to cut directly to the relevant point.

In contrast, Arrow's survey asked those respondents who indicated that the term "Swiss" primarily refers to where Swiss Army knives come from whether, assuming they were shopping for a pocketknife and came across one labeled as a Swiss Army knife but not made in Switzerland, "[w]ould the fact that the product was not made in Switzerland not influence [their] buying decision, or would that fact influence [their] buying decision." If a respondent answered that the fact would influence his or her buying decision, he or she was asked whether he or she would be influenced to the extent of not buying the product. Of the total respondents, 14 percent indicated that they would be influenced in their buying decision, and 10 percent indicated that they would be influenced to the extent that they would not buy the product. These are the figures which Arrow presented to the Court. However, if one calculates the percentage from the seventy-eight respondents who stated that the term "Swiss" primarily refers to where Swiss Army knives come from—recalling that Arrow asked only these respondents how their buying decision was influenced by where the product was made—36 percent indicated that they would be influenced in their buying decision, and 24 percent indicated that they would be influenced to the extent that they would not buy the product.

The Court finds that Forschner has proven that it is a person damaged or likely to be damaged by Arrow's representations of the Chinese knife as a Swiss Army knife. In other words, the evidence demonstrates that the consuming public finds the origin of Swiss Army knives material to its decision to purchase; persons seeking to buy a high quality multi-function pocketknife manufactured in Switzerland may purchase the Chinese knife based upon its designation as a Swiss Army knife instead of a Swiss Army knife produced by Victorinox or Wenger. As the distributor of Swiss Army knives manufactured by Victorinox, Forschner plainly faces a substantial risk of lost sales. *See Black Hills,* 633 F.2d at 753; *Johnson & Johnson,* 631 F.2d at 190; *Consolidated Distilled,* 210 U.S.P.Q. at 644. In addition, Forschner faces damages arising out of harm to the reputation of Swiss Army knives caused by Arrow's distribution of knives which are not of high quality and are made in China but are designated as Swiss Army knives.

Arrow's survey appears to support this finding of damage to Forschner, but the Court hesitates to place any weight upon its results, especially in regard to this line of examination; the manner of questioning could hardly have been more convoluted, and the Court discerns no basis for asking only those respondents who indicated that the term "Swiss" primarily refers to geographic origin how place of manufacture would influence their buying decision. Furthermore, the Court credits Dr. Cohen's testimony that the survey should have identified an alternative, *i.e.,* China, when asking respondents to consider how they would be influenced in their purchase of a pocketknife not made in Switzerland.

### D. *Affirmative Defenses*

■ 1. *Disclaimer.* Arrow contends that proper labelling cures any consumer confusion engendered by the Chinese knife. Specifically, Arrow points to the word "CHINA" found on the tang of the main blade of the Chinese knife and the words "Made in China" located on the side of the box containing the Chinese knife.

The Court finds the word "CHINA" on the main blade to be inadequate because purchasers have little, if any, opportunity to detect the label. The label is only noticeable upon close inspection of the Chinese knife, and such investigation appears highly unlikely prior to purchase given the circumstances under which the Chinese knife is distributed. Furthermore, the label is only visible on the tang of the blade when the blade is half-extended at a right angle to the rest of the knife—a somewhat peculiar position.

As to the words "Made in China" found on the box, the Court considers them to be insignificant when viewed together with the relatively mammoth display of "SWISS ARMY," "11 FUNCTION SWISS ARMY KNIFE," and "THE SWISS ARMY LOGO DESIGN" statement included on the box. The statement of origin is neither prominent nor conspicuous—as Arrow claims it to be. Furthermore, the Court notes that potential purchasers of the Chinese knife may not have an opportunity to examine the box. The testimony of Jack Dweck and his brother Michael, who is also an officer of Arrow and Colony, concerning whether Arrow's customers sell the Chinese knife in its box was vague and vacillating.[11] *See Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311 (2d Cir.1987).

■ 2. *Unclean Hands.* Arrow asserts that equitable relief is unavailable to Forschner because it does not come before the Court with clean hands. In support of this argument, Arrow claims that Forschner surreptitiously brings this action to enforce trademark rights in the term "Swiss Army knife." The Court finds the evidence to be to the contrary.

Forschner seeks to prevent the distribution of knives which are represented to be Swiss Army knives but which are not manufactured of high quality in Switzerland. In this action, Forschner neither seeks nor receives any exclusive rights in the term "Swiss Army knife." This Opinion holds that Swiss Army knives, as the Court has attempted to refer to them consistently, are Swiss-made knives of high quality and that something other than a Swiss-made knife of high quality designated as a Swiss Army knife misleads the public.

Arrow misconstrues the state of affairs with this defense. Although correspondence identified by Arrow reveals the offhanded use of language such as "brand" and "rights" in connection with Forschner's policing efforts, the Court perceives nothing unseemly, particularly in light of the credible testimony of James W. Kennedy, the President and Chief Executive Officer of The Forschner Group, Inc., on this topic. Furthermore, the Court discerns no misbehavior in instances of cooperation between Forschner and Precise in their policing efforts.

Forschner has not denied that economic benefit motivates its policing of the "Swiss Army knife" term and its institution of this lawsuit; basic economic theory dictates that it must. Such efforts by Forschner arise out of calculated decisions and merit more kudos than castigation. Forschner's conduct, both prior and subsequent to the institution of this action, bespeaks professionalism; the evidence shows that Forschner has continuously made efforts to contain the use of the term "Swiss Army knife" to high quality knives made in Switzerland and has maintained the same substantive position before the Court that it previously presented to Arrow and others when seeking to resolve differences without litigation.

Despite Arrow's charge that success to Forschner in this action signifies the bestowal of *de facto* trademark rights, the receipt of any economic benefit by Forschner does not undermine this decision. The Court merely holds that the designation of the Chinese knife, which is not of high quality and is manufactured in China, as a Swiss Army knife misleads the public. That Forschner is one of two distributors of Swiss Army knives in the United States does not impair this finding.

■ 3. *The Swiss Army and Switzerland.* Arrow has pointed to the fact that Americans are not necessarily familiar with the Swiss military as vitiating Forschner's claim. In effect, Arrow argues that its use of

11. Interestingly, Arrow compares its label of origin to that on the packaging of a "Swiss Master Utility Knife" manufactured in the United States by Colonial Knife Company ("Colonial"). Only contrasts can be drawn from this comparison. First, Colonial's packaging states "Made in U.S.A." in letters slightly larger than those stating "Made in China" on Arrow's box. Second, the words "Made in U.S.A." are found on the trim of a colorful United States flag approximately the size of a postage stamp. Third, Colonial places the words "Made in U.S.A." and the United States flag on the front of its packaging. Ironically, Colonial appears to promote its knife as made in the United States in a manner similar to the manner in which Arrow promotes the Chinese knife as a Swiss Army knife.

the term "Swiss Army knife" is proper because the public does not associate Swiss Army knives with a Swiss Army. Arrow seeks to drive its point home by noting that only one knife model is sold to the Swiss military by Victorinox and Wenger.

Arrow's argument fails. Arrow's designation of the Chinese knife as a Swiss Army knife misleads the public as to the Chinese knife's geographic origin and quality; the existence of an association made by the public between Swiss Army knives and the Swiss military is not at all pivotal to this finding. Of course, the history of Swiss Army knives relates in part to the Swiss military, and American soldiers obviously drew a connection with the Swiss military when they began employing the name "Swiss Army knife;" however, it is conceivable that Forschner's claim would succeed even if no Swiss military existed today or if no Swiss Army knives manufactured by Victorinox and Wenger were currently sold to the Swiss military.

Similarly, Arrow does not rebut Forschner's claim when it asserts that some Swiss Army knives distributed by Forschner are not red with a cross-and-shield design. The Court finds that the public perceives a Swiss Army knife to be of Swiss manufacture and high quality. Although a blue knife with a Star of David or a green knife with a shamrock may be designated a Swiss Army knife without misleading the public, a knife not of high quality manufactured in China cannot be so designated.

Notably, Arrow often focuses upon the word "Swiss" rather than concentrating upon the complete "Swiss Army knife" term. For example, Arrow's survey asked about the "Swiss" in "Swiss Army knife." Arrow called to the stand the president of Colonial who testified regarding Colonial's "Swiss Master"

knives. Arrow has identified to the Court policing efforts by Forschner which involve knives utilizing "Swiss" and not "Swiss Army knife." Such analysis is misdirected.

The Court holds that Arrow's designation of the Chinese knife as a Swiss Army knife misleads the public; the Chinese knife is represented as a Swiss Army knife primarily through the words "SWISS ARMY" and the cross-and-shield design found on the Chinese knife and the box containing it. Arrow's flights into the import of the term "Swiss" do not affect the Court's findings. In addition, the Court does not rely upon Arrow's use of the term "Swiss Style Army Knife" in its catalogue. *See* n. 6 *supra.* It is not clear to the Court that the Chinese knife is even advertised in Arrow's catalogue. The Court simply has no reason to venture into questions of whether variations in the terms "Swiss," "Army," "Style," etc., mislead the public.

### III. CONCLUSION

The Court finds that Swiss Army knives are perceived to be manufactured in Switzerland and to be of high quality and that the Chinese knife, which is neither manufactured in Switzerland nor of high quality but is represented to be a Swiss Army knife, misleads the public.

For the reasons stated above, it is hereby

ORDERED that Arrow, its officers, agents, servants, employees, and all persons in active concert or participation with them, are enjoined from advertising, promoting, selling or offering for sale the Chinese knife, or any other multi-function knife represented as a Swiss Army knife, which is not manufactured in Switzerland and of high quality.

SO ORDERED.

APPENDIX A

**ARO-1462 11-FUNCTION**
**SWISS ARMY KNIFE**
*The Pocket Survivor. 1 each:*
*scissors, corkscrew, bottle*
*and can openers, hunting*
*and carving blades, phillips*
*and flat head screwdriver*
*head, toothpick, tweezers,*
*scaling blade, nail file.*
*Stainless steel. 3½" long.*