The FORSCHNER GROUP, INC.
and Swiss Army Brands,
Ltd., Plaintiffs,

v.

ARROW TRADING CO., INC., Defendant.

No. 92 Civ. 6953 (LAP).

United States District Court,
S.D. New York.

Oct. 24, 1995.

**1412**

Oliver P. Howes, Jr., Nims, Howes, Collison, Hansen & Lackert, New York City, for the Forschner Group, Inc., Swiss Army Brands, Ltd.

Paul R. Levenson, Joseph H. Lessem, Cowan, Liebowitz & Latman, P.C., New York City, for Arrow Trading Co., Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

PRESKA, District Judge:

#### BACKGROUND

This trademark and unfair competition case returns to me on vacatur and remand from the Second Circuit Court of Appeals. *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 30 F.3d 348 (2d Cir.1994). The pertinent and undisputed facts, having been set out in my original decision and further elucidated above, will not be presented at length here. *See Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 833 F.Supp. 385 (S.D.N.Y. 1993).

Plaintiffs, The Forschner Group, Inc. and its subsidiary Swiss Brands, Ltd. (collectively "Forschner") are the distributors in this country of the well-known "Swiss Army knife," manufactured in Switzerland by Victorinox Cutlery Company ("Victorinox") and Wenger, S.A. ("Wenger").[1] First designed in 1891 by Victorinox (Wenger began producing its knife in 1908), and thereafter adopted as its exclusive knife of choice by the Swiss Army (which continues today to fill half of its orders from each company), the Swiss Army knife achieved prominence in this country when American G.I.'s returning from World War II brought this well-crafted and highly useful tool home with them. The Swiss Army knife is best known for its name, its familiar red color,[2] its multiple and multipurpose blades and utensils, and its cross-and-shield insignia. Forschner has continuously imported Swiss Army knives from Victorinox since 1950.

Early in 1992, the Arrow Trading Company, Inc. ("Arrow") began selling a red pocketknife with multiple and multi-purpose blades and utensils and a cross-and-shield insignia. Arrow calls this knife a "Swiss Army knife." This knife is manufactured in China and is comparatively inexpensive.[3] The marked difference between the prices of the Forschner Swiss Army knife and the Arrow version reflect a marked difference in quality. *See Forschner*, 833 F.Supp. at 387 ("Arrow does not dispute the fact that the Chinese knife fails to meet the standard of high quality found in a Swiss Army knife distributed by Forschner.").

#### PROCEDURAL HISTORY

Forschner's complaint, filed in September of 1992, offers three causes of action. Count I, grounded on § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), alleges misrepresentation as to origin of goods. Count II,

---

1. Forschner distributes only Swiss Army knives manufactured by Victorinox, in a relationship that has continued uninterrupted since 1950. Wenger Swiss Army knives are distributed in this country by Precise Imports Company ("Precise"), which is not a party to this litigation.

2. A few of these knives are now available in a variety of colors.

3. A standard Forschner model sells for about forty-five to sixty dollars. A similarly styled Arrow knife sells for about six to ten dollars. (Tr. 142, 273).

grounded in § 43(a)–(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), alleges false advertising with respect to geographic origin and quality. Under New York common law, Count III alleges unfair competition.

In my underlying decision, I found the allegations in Count II sufficiently supported by the record to enjoin Arrow's use of the term "Swiss Army knife" to advertise, promote or sell its knives. *Forschner,* 833 F.Supp. at 398. I held that the term "Swiss Army knife" had acquired in the mind of the consumer both qualitative and geographic significance as contemplated by 15 U.S.C. § 1125(a)(1)(B). On the strength of expert surveys, testimony and affidavits submitted by Forschner, I ruled that purchasers of a "Swiss Army knife" expect a knife that is both manufactured in Switzerland and of high quality. By holding out as a "Swiss Army knife" a knife that was not Swiss-made and not of high quality, Arrow was falsely advertising its product, misleading the purchasing public by misrepresenting both its geographic origin and its quality.

The Court of Appeals disagreed. It held that the evocation of geographic associations is not by itself sufficient to make a term geographically descriptive. *Forschner,* 30 F.3d at 355 ("The fact that a composite phrase contains a geographic term does not necessarily mean that the phrase, viewed as a whole, is a geographic designation."). Framing the question as "whether the phrase can be construed to mean that the product is made in a certain locale," *id.,* the Court found Forschner's evidence unpersuasive:

"As used in the phrase Swiss Army knife, 'Swiss' is read more naturally to modify 'Army' than 'knife'—and probably does. The phrase Swiss Army knife therefore denotes a knife of the type associated with the Swiss Army, rather than a military knife manufactured in Switzerland."

*Id.* at 356.

The use of "Swiss Army" to describe a knife was likened to the use of "Black Watch" to describe a whisky, *see Scotch Whisky Ass'n v. Majestic Distilling Co.,* 958 F.2d 594, 596 (4th Cir.) (finding that "Black Watch" does not designate a geographic origin and therefore could not be geographically

misdescriptive), *cert. denied,* —— U.S. ——, 113 S.Ct. 181, 121 L.Ed.2d 126 (1992), and to the phrase "American Girl" to describe a shoe. *See Hamilton–Brown Shoe Co. v. Wolf Bros. & Co.,* 240 U.S. 251, 257, 36 S.Ct. 269, 271, 60 L.Ed. 629 (1916) (noting the critical difference between the mark "American Shoes," which could be geographically descriptive, and "American Girl Shoes," which could not be) (cited by the Court of Appeals at 354–55).

Because the phrase "Swiss Army knife" was found not to designate geographic origin and was therefore not geographically descriptive, it could not be deceptive as to geographic origin under § 43(a) of the Lanham Act, even when used to describe a knife made in China. In effect, the Court of Appeals found that there is no danger that purchasers of a "Swiss Army knife" made in China will be misled into thinking they are purchasing a knife made in Switzerland.

Having stripped the phrase of any geographic descriptiveness, the Court then held that it necessarily lacked any qualitative descriptiveness as well:

"[t]he assurance of quality found by the district court to inhere in the phrase Swiss Army knife is purely a function of what the district court deemed to be the geographic descriptiveness of that phrase and does not furnish an independent ground for false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)–(1)(B)."

*Forschner,* 30 F.3d at 357.

Absent an inherent connotation of Switzerland, the phrase cannot connote high quality simply because consumers associate high quality with Swiss craftsmen or Swiss companies, or because Victorinox and Wenger do in fact make high quality knives, or because the Swiss Army chooses to buy its knives only from Victorinox and Wenger, since "the phrase does not in itself convey the idea that Victorinox and Wenger are the only purveyors of multi-function pocketknives to the Swiss military." *Id.* In effect, the Court found that there is no danger that purchasers of Arrow's knife will be misled merely by the use of the phrase "Swiss Army knife"

into thinking that they are necessarily buying a high quality (because Swiss) knife.

■ In sum, I understand the Court of Appeal's opinion to say the following, and no more: Arrow has not falsely advertised. Forschner's allegation that Arrow's use of "Swiss Army knife" is geographically and qualitatively deceptive, and thus constitutes false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), is unsubstantiated and therefore insufficient to enjoin its use. But this does not mean that Arrow's use of "Swiss Army knife" is beyond the reproach of the law. Whether Forschner's remaining claims—essentially alleging unfair competition under both Federal law and New York common law [4]—have been proved so as to provide alternative grounds to deny, restrict or circumscribe Arrow's use of the phrase remains for this Court now to decide.

## DISCUSSION

### I. Nature of the Action

It has been accurately noted that "the body of law relating to the Lanham Act has developed into a tangled morass." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 171 (2d Cir.1991). To avoid adding to this tangle, and to clarify what is at stake in this action, I find it useful first to clarify what is not directly at stake.

### A. Trademark

This is not, strictly speaking, a trademark case. There is no registered trademark at stake and no infringement alleged.[5]

Count I of the complaint is brought under § 43(a) of the Lanham Act "to remedy false descriptions and representations in commerce," Complaint, ¶ 11. It addresses "acts of the defendant [that] are likely to and do cause confusion, deception or mistake." Id., ¶ 18. Count III, alleging unfair competition under New York common law, complains of "the activities of the defendant and the dress of [defendant's] knives." Id., ¶ 40. These are not demands for trademark protection. Yet Forschner in its arguments on remand presses this court to enjoin Arrow from any and all use of "Swiss Army knife" to describe its product. To do so would effectively grant Forschner trademark protection. This aspect of Forschner's argument ignores the prior proceedings of the case, including its own pleadings.

My underlying decision held that "the existence of a trademark is not an issue." *Forschner*, 833 F.Supp. at 388. The Court of Appeals agreed. *See Forschner*, 30 F.3d at 358 ("Forschner is not seeking trademark protection for the phrase Swiss Army knife."). The phrase "Swiss Army knife" has never enjoyed trademark protection, as Forschner readily concedes in its complaint.[6] See Complaint, ¶ 14. Because the issue was not presented, it was never reached, and the Court of Appeals left unanswered the question of whether the mark is registerable.[7]

Forschner has moreover interpreted its own pleadings as foreclosing the possibility that it is entitled to the exclusivity of use afforded by trademark protection. It has

---

**4.** As the Court of Appeals noted, Forschner's claim in Count I of misrepresentation of source under § 43(a) of the Lanham Act is a claim of unfair competition. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 639 (1st Cir.1992) ("The statutory prohibition against false designation of origin encompasses more than deception as to geographic origin; it extends as well to origin of source, sponsorship or affiliation.") (citation omitted).

**5.** Since 1908, Victorinox and Wenger have co-existed as separate producers of the Swiss-made Swiss Army knife; neither has (or ever has had) trademark rights in the name. *See Forschner*, 833 F.Supp. at 389.

**6.** One obvious possible impediment to registration, in light of the fundamental requirement that

a trademark identify and distinguish a single source for a given product, *see* 15 U.S.C. § 1127, is the dual manufacture (Victorinox and Wenger) of the Swiss-made Swiss Army knife.

**7.** Following the Court of Appeals decision, Victorinox and Wenger filed jointly an application with the Patent and Trademark Office in the United States ("PTO") for registration of "Swiss Army" as a trademark. See Nov. 29, 1994 Letter from Plaintiff. Two Office Actions have since been issued from the Patent Office. The first action indicated that the term as applied was merely descriptive. See May 8, 1995 Letter from Plaintiff. The second action indicated that the term as applied was generic. See September 13, 1995 Letter from Plaintiff; PTO Office Action 74/609279, dated September 5, 1995.

admitted, for example, to "plaintiff's earlier reluctance to claim trademark status," Plaintiff's Reply Memorandum on Remand, at 6; that "plaintiffs did not before press trademark rights," id. at 5; and that "[p]laintiffs did not initially cast this suit in strict trademark terms." Id. at 4. It cannot be recast now.

Falling back to a more defensible position, Forschner argues that "[w]hether there is or is not a trademark does not resolve the question whether consumers might mistake the Arrow knife for one manufactured by Victorinox and Wenger." Id. at 5. In this assertion they are correct. The gravamen of the remaining counts is unfair competition, which by definition does not focus on the strength or registrability of the plaintiff's mark. Therefore I am not required to evaluate the senior user's mark and place it somewhere on the spectrum of distinctiveness by determining if it is arbitrary, fanciful, suggestive, descriptive, or generic. See Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4 (2d Cir.1976). Rather, an allegation of unfair competition requires an evaluation of the impact upon Forschner of Arrow's use of the same mark and similar dress on the same product sold by Forschner.

## B. Genericness

The issue of genericness has been vigorously argued by the litigants throughout this litigation. When the action is properly cast, however, neither Forschner nor Arrow stands or falls on genericness alone. Given the pleadings and the proofs offered by the parties, however, and for the reasons discussed below, I find it necessary to a fair disposition of this case to assume that the phrase "Swiss Army knife" is generic.

A term is generic if it simply names the thing to which it is ascribed. See Abercrombie & Fitch, 537 F.2d at 9 ("[a] generic term is one that refers, or has come to be understood as referring, to the genus of which the product is a species."). As such, it "is the very antithesis of a mark," 1 J. Thos. McCarthy, Trademarks and Unfair Competition, § 12:1, at p. 250 (2d ed.1984) (hereinafter McCarthy), the purpose of which is to distinguish the seller's particular version of a given type of good. ("Car," for example, is generic; "Mustang" is not.) To allow one party to claim a generic name for its exclusive use would be tantamount to granting it a monopoly over the thing it named. Thus trademarks, which guarantee exclusive use, are not granted for generic terms. See, e.g., Kellogg Co. v. Nat'l Biscuit Co., 305 U.S. 111, 116, 83 L.Ed. 73 (1938).

In framing the issues on remand, and in guidance to this court, the Court of Appeals assumed arguendo that "Swiss Army knife" was a generic phrase for a multipurpose pocketknife. Forschner, 30 F.3d at 359. Its purpose in doing so is clear. Were it eligible for trademark protection, the weakest that the phrase "Swiss Army knife" could rate on the "spectrum of distinctiveness" is generic. See Abercrombie & Fitch, 537 F.2d at 9. Generic terms, for the reasons discussed above, traditionally receive the least protection from trademark and unfair competition law. If Forschner's use of the phrase "Swiss Army knife" merits some protection when it is assumed to be generic, it will receive no less if later—when properly before a court or the Patent and Trademark Office—it is determined to be otherwise.[8] Assuming genericness establishes a baseline for unfair competition beneath which new-

8. Clearly, "Swiss Army knife" is neither an arbitrary mark (one which lacks intrinsic connection to the object it names) nor a fanciful mark (coined expressly to designate the new product or organization). See generally McCarthy at § 11.4 (discussing arbitrary marks) and § 11.3 (discussing fanciful marks). Although the Court of Appeals ruled that it is neither qualitatively nor geographically descriptive, "Swiss Army knife" may still be a merely descriptive mark. It is therefore either suggestive, merely descriptive or generic. It is assumed here to be generic, an assumption that cannot give it *more* protection than were it assumed to be descriptive or suggestive. To be protected against unfair competition, as discussed below, a generic term must have acquired some secondary meaning. Trademark protection is not available for a generic term no matter how much distinctiveness it has acquired. See Abercrombie & Fitch, 537 F.2d at 9. Descriptive terms, in contrast, are eligible for trademark protection if they have acquired secondary meaning. Id. Suggestive terms are eligible for trademark registration, and the exclusive use that accompanies it, without a demonstration of secondary meaning. Id. at 11.

coming competitors cannot stray without violating § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

Forschner in its arguments on remand chafes against the "minimum" level of protection afforded by genericness. But the restriction is self-imposed. Plaintiff's pleadings do not allow it to ask for more; nor do its proofs indicate that it would be entitled to more. In addition, to consider more protection would be to confer upon Forschner the *de jure* trademark protection that plaintiff, this court and the Court of Appeals agree is not available.

The question is whether the law of unfair competition—under Federal law or New York common law—protects one company's longtime and exclusive use of an unregistered and presumably unregisterable mark from the later and allegedly predatory use of the same mark on the same product similarly dressed.

Assuming "Swiss Army knife" to be generic opens rather than closes my inquiry.[9] Although genericness prevents a word or phrase from attaining trademark protection, it does not prevent a court from determining whether a competitor's later use of that word or phrase is unfair. *See Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938); *Murphy Door Bed Co., Inc. v. Interior Sleep Systems, Inc.*, 874 F.2d 95, 102 (2d Cir.1989); *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035 (D.C.Cir.1989); *Miller Brewing Co. v. Joseph Schlitz Brewing Co.*, 605 F.2d 990 (7th Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980). The public policies which shape the law of trademarks and unfair competition—primarily preventing consumer confusion on the one hand while promoting and rewarding healthy competition on the other, *see generally* McCarthy,

§ 1:1 (unfair competition) and § 2:1 (trademark)—are as appropriate with generic terms as any other.

## II. Unfair Competition under Federal Law

■ Unfair competition is conceptually broader than trademark protection. *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *S.C. Johnson & Son v. Johnson*, 175 F.2d 176, 178 (2d Cir.) *cert. denied*, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949); *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861, 863 (S.D.N.Y.1962), *aff'd*, 312 F.2d 125 (1963); McCarthy at § 8:1.

■ Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125–(a)(1)(A), prohibits the conduct of:

[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

This section has frequently provided the bulwark of unfair competition claims. *See, e.g., Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577 (2d Cir.1993); *Feathercombs, Inc. v. Solo Prod. Corp.*, 306 F.2d 251 (2d Cir.), *cert. denied*, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962) "Though enacted as part of the Trademark Act, this

---

**9.** Arrow has argued throughout this litigation that "Swiss Army knife" is generic. See Defendant's Pretrial Memorandum of Law, at 3. At the trial level, I found that as to the false advertising claim on which my decision was based, Arrow's rebuttal of genericness was non-responsive. *See Forschner*, 833 F.Supp. at 392. I also found Arrow's survey, as designed to elicit the geographic significance of the phrase, to be flawed and "unconvincing" of genericness. *Id.* at 395 (calling the survey "substantially immate-

rial to both Forschner's claim [of geographic and qualitative deception] and Arrow's own argument of genericness"). Thus, my prior consideration of genericness was confined solely to Count II of the complaint, and is not a finding of law that is binding on my disposition of the unfair competition claims. As for the Court of Appeals, its only finding on the issue was that, "[a] phrase or term that is not geographically descriptive is not *necessarily* generic." *Forschner*, 30 F.3d at 357 (emphasis added).

provision functions as a federal law of unfair competition for unregistered goods." *Coach Leatherware*, 933 F.2d at 168. Protection under this provision extends not only to the name of the good, but to its overall presentation, or "dress." "Section 43(a) extends protection to a product's 'trade dress'—the total image of a good as defined by its overall composition and design, including size, shape, color, texture, and graphics." *Id.*

■ The Lanham Act does not under § 43(a) or any of its provisions offer protection against a claim of unfair competition predicated solely on the competing use of a generic term. *See Kellogg*, 305 U.S. at 116, 59 S.Ct. at 112; *Blinded Veterans Ass'n*, 872 F.2d at 1043; *Miller Brewing*, 605 F.2d at 997 ("Under no circumstances is a generic term susceptible of *de jure* protection under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) or under the law of unfair competition."). A persuasive body of case law has developed, however, to support a claim that begins with a late-coming competitor's use of a generic mark but encompasses a broader cause of action.[10] *See Blinded Veterans Ass'n*, 872 F.2d at 1043–44 (citations omitted).

■ This broader cause of action requires the proof of two essential elements: (1) an association of origin by the consumer between the mark and the first user, and (2) a likelihood of consumer confusion when the mark is applied to the second user's good. *Coach Leatherware*, 933 F.2d at 168 ("To prevail on a trade dress claim the plaintiff

must demonstrate that the product's appearance has acquired 'secondary meaning'—the consuming public immediately identifies the product with its maker—and that the purchasers are likely to confuse the imitating goods with the originals."); *Joshua Meier Co. v. Albany Novelty Mfg. Co.*, 236 F.2d 144, 147 (2d Cir.1956) (plaintiff will prevail under § 43(a) "if the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of same or similar marks by another company constitutes a representation that its goods came from the same source").

■ Association of origin, or secondary meaning, indicates that the seller, through an expense of time, effort and money, has built up good will in his product, such that the consumer, when perceiving the mark, primarily associates it with the producer of the good and not merely the good itself. *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982); *Centaur Communications Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1221 (2d Cir.1987). In this case, the consumer would have to associate the phrase "Swiss Army knife" with *Forschner's* product, not simply with a multi-function pocketknife. When there is an association of origin, the senior user's good will is susceptible to misappropriation by the junior user who "passes off" his goods as those of his competitor.[11]

■ The second prerequisite is a likelihood that the public will confuse the junior

---

10. Relief is available without regard to how the mark became generic, *i.e.*, whether it was generic *ab initio;* whether it had been exclusively associated with a product by virtue of a now-expired patent; or whether over time the mark simply lapsed into the public domain. *See Blinded Veterans Ass'n*, 872 F.2d at 1044 n. 20 ("Regardless of how a generic term becomes associated with a particular source, once it does, late-coming competitors may be required to distinguish themselves or their products sufficiently to prevent confusion.") (citations omitted).

11. The term "passing off" is the source of some confusion. Under common law, unfair competition was more closely associated with the tort principle of fraud. See McCarthy §§ 8:5, 25:1. "Passing off" connoted intentional wrongdoing, as when a competitor deliberately copied trade

dress or packaging, or deceitfully filled orders for one producer's goods with the competitor's own goods. *Id.* As the law evolved, intent became a separate and non-essential element. *See Coach Leatherware*, 933 F.2d at 169. "Although at one time the law of unfair competition was limited to claims that one party had attempted to pass off his goods as those of another party, unfair competition is now held to encompass a broader range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another." *American Footwear Corp. v. Gen. Footwear Co Ltd.*, 609 F.2d 655, 662 (2d Cir.1979) *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980) (citations omitted). Today, most courts speak of "passing off" as a species of "unfair competition," but without the fraud element. *See, e.g., Blinded Veterans*, 872 F.2d at 1045.

user's product with the senior user's product.[12] Confusion need only be likely, not certain, and all consumers need not be likely to be confused. Here, Forschner must show that it is likely that consumers having it in mind to purchase one of its Swiss Army knives will be misled by Arrow's use of the same mark and similar dress into purchasing an Arrow knife by mistake. *See Am. Footwear Corp. v. Gen. Footwear Co Ltd.*, 609 F.2d 655, 662 (2d Cir.1979) (unfair competition can arise "by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor"), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 939 (7th Cir.1986) ("an unfair competition claim might be supportable if consumer confusion or a likelihood of consumer confusion arose from the failure of the defendant to adequately identify itself as the source of the product") (citation omitted).

In other words, in order for a claim of unfair competition founded on a junior competitor's use of a generic term to succeed there must be: (1) something valuable to lose (consumer good will), and (2) a likelihood that it will be unfairly taken (consumer confusion).

I find that Forschner's proofs adequately support a finding of both association of origin and likelihood of confusion. Before setting out this basis for this finding, I find it useful to first set out the precedents which guide my analysis and stand out from the "tangled morass" as straight paths of reason. The precedents are decisions by the Supreme Court in *Kellogg v. Nat'l Biscuit, supra*, and current Supreme Court Justice Ruth Bader Ginsburg's decision for Court of Appeals for the District of Columbia in *Blinded Veterans Ass'n v. Blinded Am. Veterans Found., supra*.

In *Kellogg*, use of the phrase "shredded wheat" was at issue. The posture of the litigants was not unlike that of the present litigants.

[Plaintiff] charges that the defendant, by using the name and shape, and otherwise, is passing off, or enabling others to pass off, Kellogg goods for those of the plaintiff. Kellogg Company denies that the plaintiff is entitled to the exclusive use of the name or the pillow-shape; denies any passing off; asserts that it has used every reasonable effort to distinguish its produce from that of the plaintiff; and contends that in honestly competing for a part of the market for shredded wheat it is exercising the common right freely given to manufacture and sell an article of commerce unprotected by patent.

*Kellogg*, 305 U.S. at 115, 59 S.Ct. at 112.

The Court began by finding the phrase to be generic and therefore not appropriate for exclusive use. *Id.* at 116, 59 S.Ct. at 112. But it then noted that because the National Biscuit Company had been the only manufacturer of shredded wheat for many years, the public had come to associate that product with them. "Fairness" therefore obliged Kellogg to use the name "in a manner which reasonably distinguishes its product from that of [National Biscuit]." *Id.* at 120, 59 S.Ct. at 114. Kellogg was found to have distinguished its product by selling it in "distinctive" cartons of a different size, shape and color, containing a greater number of smaller biscuits, and with a label of "striking" difference that announced the product in bold script as coming from "Kellogg's." *Id.*

It is interesting to note here that the Court rejected National Biscuit's argument that any possibility of passing off was most certain to be extinguished if Kellogg would simply not use the name shredded wheat or the pillow-shaped biscuit. *Id.* at 121, 59 S.Ct. at 114. But there is no "least intrusive" analysis in unfair competition law. The key struck by the Court is one of balance. Public deception and free-riding on another's good will are to be prohibited. But in the name of healthy competition, a junior user will not be unnecessarily restrained from availing itself of the public appetite for

---

**12.** Conceivably, the claim could also be brought by a junior user who, having outperformed a first user of a generic mark without unfairly competing and built up with the public an association between the mark and its good, finds that the first user has altered its trade dress to confuse its product with the junior user's more popular product.

a given product. *Id.* at 121–22, 59 S.Ct. at 114–15.

In *Blinded Veterans Ass'n,* the plaintiff ("BVA") was a nonprofit organization founded in 1945 to provide various services to veterans who had lost their sight. BVA sought to enjoin the Blinded Americans Veterans Foundation ("BAVF"), chartered in 1985 to provide a variety of services to disabled veterans, from using the words "blinded" and "veterans" in its name and from using the initials "BVA" to describe itself. *Blinded Veterans Ass'n,* 872 F.2d at 1036. BVA had not registered "blinded veterans" as a trademark. Writing for the court, Judge Ginsburg first held that the term "blinded veterans" was generic. This finding prevented BVA from acquiring trademark protection but it did not end the court's inquiry. Turning to the still live issue of unfair competition and citing "the paradigm case" of *Kellogg* and its progeny, Judge Ginsburg held that "the subsequent competitor cannot be prevented from using the generic term to denote itself or its product, but it may be enjoined from passing itself or its product off as the first organization or its product." [13] *Id.* at 1043. The district court on remand was to look for the "essential" evidence of both (1) an association by the public of "blinded veterans" with BVA and (2) a likelihood that "because of specific actions by BAVF that increase the risk of confusion" people would think that BAVF was BVA. *Id.* at 1046. If both were found, the district court could "require the competitor to take whatever steps were necessary to distinguish itself or its product from the first organization or its product." *Id.* at 1042.

### A. Identity of Origin and Secondary Meaning

The threshold issue is whether consumers associate the phrase "Swiss Army knife" with a particular manufacturer of multi-function pocketknives. Although it is more difficult to establish secondary meaning in a generic term than a descriptive term, *see Union Carbide Corp. v. Ever–Ready Inc.,*

531 F.2d 366, 380 (7th Cir.) (citations omitted), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976), I find that the phrase "Swiss Army knife" has acquired secondary meaning. Over the 104–year history of the knife, consumers have come to associate this familiar and distinctive product with Victorinox and Wenger. In my original decision, four explanations for this association were given. *Forschner,* 833 F.Supp. at 389–90. First, Victorinox and Wenger have built up over a century of history and reputation in this country, a reputation that was galvanized when American soldiers returning from the war in Europe brought with them knives made by these manufacturers. It was at this point that the knives, made only by these two manufacturers, became known here as "Swiss Army knives."

Second, both manufacturers have engaged in extensive advertising and promotion of their knives. In an agreement between the two American distributors, Forschner also uses the term "Original" to advertise and promote the Victorinox Swiss Army knife, while Precise uses the term "Genuine" to advertise and promote the Wenger Swiss Army knife. *Forschner,* 833 F.Supp. at 389. These efforts have further connected the knives to their Swiss manufacturers in the public consciousness.

Third, Forschner has undertaken assiduous policing of the phrase against its application to any knives other than those manufactured by Victorinox and Wenger. As noted in my original opinion, "[r]emarkably, Forschner has demonstrated during trial that it had sent 'cease and desist' letters in response to each instance identified by Arrow of the use of the 'Swiss Army knife' term in connection with the sale of a pocketknife not manufactured by Victorinox or Wenger." *Forschner,* 833 F.Supp. at 389–90. I am still aware of no advertisements other than Arrow's that apply the term to a knife not manufactured by Victorinox or Wenger.

Fourth, it is apparent that a myth or mystique has grown up around Victorinox and Wenger knives since Karl Elsener turned out

---

13. Although *Blinded Veterans Ass'n* dealt with competing organizations, the passing off of one product for another is analogous to the passing off of one organization for another. *See Blinded Veterans Ass'n,* 872 F.2d at 1043.

his first multipurpose, utensil-laden pocket-knife in 1891. *See Forschner,* 833 F.Supp. at 387. The manufacturer of any product would be happy to share the anecdotal history of these knives: a Victorinox knife is part of the Museum of Modern Art collection; Swiss Army knives are brought with astronauts on space missions; and they are a favored gift to guests at the White House. As the Court of Appeals noted, "[t]he multi-function pocketknives made by Victorinox and Wenger are renowned for their quality and durability, and are the object of a mystique." *Forschner,* 30 F.3d at 350.

■ Identity of origin is not blurred by the dual manufacture of the Swiss-made "Swiss Army knife." Victorinox and Wenger are the only suppliers of knives to the Swiss Army. The Court of Appeals noted that the association between the consumer and these manufacturers is "buttressed" by the fact that the consumer associates the knives more with the Swiss Army than with Switzerland. *Id.* at 359. "Since Victorinox and Wenger are the only manufacturers who sell pocketknives to the Swiss Army, there is reason to associate the phrase Swiss Army knife with those two companies." *Id.* at 359–60. Dual origin, even dual origin as closely aligned historically and in the public consciousness as Wenger and Victorinox, with their combined 191 years of experience in manufacturing Swiss Army knives, may preclude the registration of this mark, but it does not preclude a finding of unfair competition. Like Victorinox and Wenger in Switzerland, Forschner and Precise have managed to coexist in this country for many years. Arrow cannot now enter the picture and unfairly compete with Forschner merely by pointing to Precise, or vice versa.

■ Arrow has challenged this association between product and manufacturer by arguing that the consuming public "has little or no awareness of Victorinox or Wenger as the source of origin of Swiss Army knives." Defendant's Memorandum of Law on Remand, at 5. An association of origin does not require the purchaser to be aware of the actual name or identity or location of the manufacturer—but only that the purchaser perceives the goods as emanating from a single source. *See Union Carbide,* 531 F.2d at 380. A purchaser can associate a Mustang with a particular car manufacturer without knowing that the manufacturer is called "Ford" and is headquartered in Detroit, Michigan.[14]

The absence of Precise, Wenger's distributor, in no way hinders Forschner's efforts to protect its own interests. Arrow's duty is owed to both. "Accordingly, Arrow must take 'every reasonable precaution' to distinguish its Swiss Army knife from the Swiss Army knives produced by Victorinox and Wenger." *Forschner,* 30 F.3d at 360, citing *Kellogg,* 305 U.S. at 122, 59 S.Ct. at 115.

Thus I come to the conclusion that there is in the public mind a definite "association between the knives, on the one hand, and Victorinox and Wenger and their distinctive histories and prominent reputations, on the other." *Forschner,* 833 F.Supp. at 389. The Court of Appeals is in agreement on this point, having called the association "undeniable." *Forschner,* 30 F.3d at 350.

**B. Likelihood of Confusion**

■ I find it likely that consumers will confuse the Arrow Swiss Army knife with the Forschner Swiss Army knife.[15]

---

**14.** Forschner President James Kennedy testified at trial that his company had not "done a very good job" of distinguishing itself and Victorinox knives from Precise and Wenger knives in the minds of consumers. Tr. 190–91. This type of fine line-drawing is not the same as identifying a product with its source, which requires only that the public identify the "original" or "genuine" Swiss Army knife with a particular manufacturer, not that it know the names of the manufacturers or be able to distinguish the two. What *is* at issue here is not a likelihood of consumer confusion between Precise and Forschner—who are essentially both senior users, but as to Forschner

knives and knives from Arrow—who is a junior user.

**15.** The multi-factor test set out in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961) is inapplicable here. Although a "likelihood of confusion" is indeed the cornerstone of both unfair competition and trademark infringement analysis, *see, e.g., Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979), the *Polaroid*

The concept of "fairness" in this area of the law, as elsewhere, is double-edged. Fairness allows a competitor to make use of a generic term to describe its product; but fairness also requires such use to be reasonably distinguishable from that of the competitor who has already invested in that term and imbued it with secondary meaning. Forschner, through its own effort and expenditure and ingenuity, has done well to create a market in this country for Swiss Army knives. Arrow, however, cannot be enjoined from using its own effort, expense and ingenuity to enter this market and capitalize on the public appetite for this product. The Supreme Court made this clear in *Kellogg*. "Sharing in the goodwill of an article unprotected by patent or trademark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested." *Kellogg*, 305 U.S. at 122, 59 S.Ct. at 115. But Forschner can expect that Arrow will not be allowed to profit by so closely modelling its product after Forschner's that the public confuses the two, buying Arrow's product but expecting Forschner's. "The purchasing public is entitled to know the source of the article it desires to purchase." *King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 581 (2d Cir. 1963).

Arrow repeatedly argues in its papers on remand that Forschner's remaining allegations and the decision on appeal leave me with only the slimmest of factual issues to reconsider. In Arrow's interpretation, the Court of Appeals' holding that it could not be enjoined under 15 U.S.C. § 1125(a)(1)(B) from using the phrase "Swiss Army knife" to describe an inexpensive Chinese-made knife somehow removes that phrase from the calculus of unfair competition, such that this court "must focus on what, if anything, Arrow has done *other than and in addition to* using the phrase 'Swiss Army knife' that might lead consumers to believe that the Arrow knife is made by Victorinox or Wenger." Defendant's Memorandum of Law on Remand, at 19 (original emphasis). Specifically, that additional behavior would consist

only of "the licensing language on the package for Arrow's knife and the trade dress of the knife." Id. at 10. This argument is without support in the law and exaggerates the breadth of the decision on appeal. *See Forschner*, 30 F.3d at 358 ("Our determination that Arrow did not misrepresent the geographic origin or quality of its knife does not absolve Arrow of liability for other forms of misrepresentation or unfair competition, such as passing off.").

Whereas Forschner's allegation of false advertising under 15 U.S.C. § 1125(a)(1)(B) required this court to look at whether the phrase "Swiss Army knife" was geographically or qualitatively deceptive *only as applied to the Arrow knife*, its allegation of unfair competition under 15 U.S.C. § 1125(a)(1)(A), with its pivotal element of "likelihood of confusion," requires a *comparative analysis* of the phrase as applied to both the Arrow and the Forschner knives. This comparative analysis considers not simply of all "other" aspects of Arrow's packaging, promotion and design of its product, but of the disputed phrase itself. The section provides a cause of action against any person who "in connection with any goods ... uses in commerce any *word, term, name, symbol, or device, or any combination thereof* ... which is likely to cause confusion...." 15 U.S.C. § 1125(a) (emphasis added). *See Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.*, 281 F.2d 755, 762 (2d Cir.1960) ( [i]t is the general overall impression which counts"); *Jean Patou*, 201 F.Supp. at 862 ("a claim for unfair competition considers the total physical image given by the product and its name together ... unfair competition exists if the total impression of package, size, shape, color, design and name upon the mind of the consumer will lead him to confuse the origin of the product"); *see generally* McCarthy, § 8–1.

A likelihood of confusion does not require a mirror image. It is predicated on a "multiplicity of similarities." *Ritchie*, 281 F.2d at 759. The use of the same mark on

---

test presupposes the existence of a valid trademark. *See, e.g., C.L.A.S.S. Promotions v. D.S.*

*Magazines, Inc.*, 753 F.2d 14, 17 (2d Cir.1985).

two different products, regardless of whether it is generic or not, is perhaps the most salient similarity that can confront and confuse a consumer. Of course, it cannot be the use of the generic mark that alone constitutes unfair competition, *see Blinded Veterans Ass'n,* 872 F.2d at 1043, but that redundant use certainly may contribute to a likelihood of consumer confusion. The non-exclusivity of any element of the latecomer's trade dress does not prevent that element from contributing to the confusion of the competing goods in the consumer's mind and therefore is not excused from a court's analysis of whether such confusion is likely.

It will not do for a subsequent maker of a product ... to segregate the details of the earlier trade package and dress, and then, on the theory that the first user does not possess an exclusive right to them separately, appropriate them in whole or substantial part by piecemeal.... This ignores the first user's grouping of parts, of details, for the very purpose of denoting the origin of his product; it is through such distinctive characteristics, considered in a unitary way, that the first user and the public can be protected against confusion and deception as to his product.

*O & W Thum Co. v. Dickinson,* 245 F. 609, 619 (6th Cir.1917), *cert. denied,* 246 U.S. 664, 38 S.Ct. 334, 62 L.Ed. 928.

Thus Arrow cannot avoid a finding of consumer confusion by arguing that (1) "Swiss Army knife" is generic, (2) the Arrow cross-and-shield insignia is, as I have found, distinguishable from Forschner's, *Forschner,* 833 F.Supp. at 387, and (3) Forschner has no trademark rights in the color red as applied to its multipurpose pocketknives.[16] Nevertheless, it should be stressed that my finding of likely confusion, although for purposes of clarity necessarily traced through a step-by-step analysis, is not based on dissecting the competing trade dress and enumerating discrete points of similarity, but on the total image created. *See Merriam–Webster, Inc. v. Random House, Inc.,* 35 F.3d 65, 70–72 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995).

■ Whether there is a likelihood of confusion is a fact-specific inquiry. Because it is so difficult to acquire, there need not be evidence of actual consumer confusion. *See Blinded Veterans Ass'n,* 872 F.2d at 1047; *Ritchie,* 281 F.2d at 761. The standard applied is that of the ordinary or "average consumer," similar to the "reasonable person" standard in tort law. *See RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 (2d Cir.1979); *Feathercombs,* 306 F.2d at 257; McCarthy § 8:4, at 291–92. The Second Circuit has rejected the argument that the ordinary buyer must be a "careful" one. *Am. Chicle Co. v. Topps Chewing Gum, Inc.,* 208 F.2d 560, 563 (2d Cir.1953).

■ I will not consider for purposes of this comparison the packaging of the two knives, in light of the fact that Arrow primarily sells to its customers through mail order catalogs. *See Forschner,* 833 F.Supp. at 387. In the Arrow catalog introduced as evidence at trial, only the knives, and not their packaging, are displayed.[17] See Plaintiff's Exhibit no. 1. I will also not consider, of course, similarities between the two knives—such as size, shape, and weight, as well as the number and configuration of the various blades and utensils—which are functionally necessary to a multipurpose pocketknife. *See Coach Leatherware,* 933 F.2d at 168 ("Even if the plaintiff establishes [identity of origin and likelihood of confusion], the defendant may still avoid liability by demonstrating that the imitated features are "functional"—essential to the basic purpose the article is meant to serve."). Finally, I will not dwell

---

16. Which is not to say that Forschner would not be able to get trademark protection for the red of its knives. *See Qualitex Co. v. Jacobson Products Co., Inc.,* —— U.S. ——, ——, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995) (finding that neither the principles of trademark law nor of the functionality doctrine necessarily prevent "color alone ... [from] meet[ing] the basic requirements for use as a trademark").

17. Even were they not primarily sold by Arrow to its customers through mail orders, the importance of distinctive packaging would be suspect. Unlike facial tissues, cereals or shampoos, in which the goods are always presented by the seller and perceived by the consumer in their packaging, knives are usually displayed by the seller and selected by the consumer out of their packaging.

on whether Arrow intended to dress its knife in such a way as to confuse it in the minds of purchasers with the Forschner knife, although the closeness of its dress (not to mention the choice of mark and color) and Arrow's awareness of the senior user suggest a deliberate effort to siphon off Forschner's good will.[18] *See RJR Foods,* 603 F.2d at 1060 ("conscious imitation also supports at least a presumption that the similarity will cause customer confusion"), *citing Ritchie,* 281 F.2d at 758–59; *My–T–Fine Corp. v. Samuels,* 69 F.2d 76, 77 (2d Cir.1934). Even proof of intentional copying, while probative, is not dispositive on the issue of unfair competition—for the reason that a vendor may have tried, but failed, to engender confusion. *See Blinded Veterans Ass'n,* 872 F.2d at 1045; *Coach Leatherware,* 933 F.2d at 169.

To begin, Arrow has embossed on the side of its knife the words "Swiss Army." The Forschner knife does not. Yet since this difference brings to the consumer's mind the very phrase that consumers have come to associate with Victorinox and Wenger, it invites confusion as much as avoids it.

The handle of the Arrow knife is a shade of red that is distinguishable from the red used by Forschner on most of its knives, and formerly used by Forschner on all of its knives. The distinction is clear in a side-by-side analysis, but side-by-side analysis is not the standard for determining likely consumer confusion. *See RJR Foods,* 603 F.2d at 1060; *Ritchie,* 281 F.2d at 762. The difference is less apparent when the Arrow knife is viewed in isolation. Color is "obviously an important element to consider in determining unfair competition," McCarthy, § 8.3, at 289, and it cannot be said to be a part of the functionality of the knife.[19] In addition, the handle of the Arrow knife, like the handle of the Forschner knife, is monochromatic except for its insignia.

Like Forschner, Arrow builds into its standard model both a toothpick and tweezers. Although most likely functional elements, Arrow has chosen to place them in exactly the same positions as the Forschner knife, together at one end of the knife, on opposite sides of the handle. Likewise, the Arrow knife has a key ring attached to a eyelet at one end of the knife, as does Forschner.

Although the Arrow cross-and-shield insignia is distinguishable from Forschner's, it is placed in exactly the same location on the handle of the knife: above center, close to one end. It also, like Forschner's, is monochromatic (Forschner's is silver, Arrow's is white) and appears only on one side of the knife. On both knives, the handles have a smooth, high-gloss finish.

At the base of the tang of the main blade of the Forschner knife, nearest to the handle and visible only when the blade is open, is inscribed the legend "VICTORINOX/SWITZERLAND/STAINLESS/ROSTFREI." In the same place, the Arrow knife bears the legend "STAINLESS/CHINA." These inscriptions are themselves quite distinct. The impact of this distinction is muted, however, by their placement on the knife. Unlike color, mark, insignia and mechanical features, inscriptions are hardly a selling point of the knives, and their placement makes them further unlikely to catch the attention of the potential buyer, particularly the purchaser ordering through a catalog (the legend is not visible on the knife pictured in the Arrow catalog). However dissimilar, the legends are not likely to diffuse consumer confusion.

Arrow argues that wide price differentials—the Arrow knife typically sells at $6 to $10, and the Forschner knife at $45 to $60—

**18.** Arrow President Jack Dweck testified at trial that he was aware before choosing the name "Swiss Army" for Arrow knives that it was already being used on multi-function pocketknives, and although not aware of Forschner by name he was aware of Victorinox. Tr. 247–248. Dweck further testified that he adopted the "Swiss Army" name, after consult with his attorney, only because it was "descriptive" of the product; and a cross-and-shield logo because "all Swiss

Army knives have a version of a cross and shield." Tr. 249.

**19.** There was some discussion before me that the red of the Swiss-made Swiss Army knife was to keep it from getting lost in the snow if it were dropped. This may be so, and Arrow may also want to color its knife so as not to be lost in the snow, but red is not the only color that would achieve this purpose.

can be a "significant factor" in preventing confusion. Defendant's Memorandum of Law on Remand, at 24. Arrow offers one case from this Circuit to support its argument, *Speedry Prod., Inc. v. Dri Mark Prod., Inc.,* 271 F.2d 646 (2d Cir.1959). In *Speedry,* affirming the denial of a preliminary injunction, cost was the last of several salient distinctions considered, including two distinct trade names ("Magic Marker" and "Dri Mark") and distinctly colored and lettered packaging. In addition, cost seems to me a dubious badge of distinction. If consumer confusion is going to occur, it would seem to occur most naturally when consumers find a product they desire at a lower cost than expected. If anything, the lower cost might disarm the consumer of his or her ordinary vigilance—this is the lure that makes knock-offs attractive. *See RJR Foods,* 603 F.2d at 1061 (affirming finding by Pierce, J., that "the products' modest cost was not conducive to the exercise of careful selectivity by purchasers") (citation omitted).

A likelihood of consumer confusion, which looks through the eyes of the prospective purchaser, can conversely be thought of as the affirmative duty of the junior user to name and dress his goods so as to distinguish them from his competitor's goods and identify itself as their source. *See Kellogg,* 305 U.S. at 120, 59 S.Ct. at 114 (Kellogg was free to use the generic mark "shredded wheat," "subject only to the obligation to identify its product lest it be mistaken for that of the plaintiff"); *Ritchie,* 281 F.2d at 758 ("In this circuit and others, numerous decisions have recognized that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer."). This obligation was defined by the Supreme Court in *Kellogg,* 305 U.S. at 122, 59 S.Ct. at 115 (Kellogg was not guilty of passing off because it had "*taken every reasonable precaution to prevent confusion* or the practice of deception in the sale of its product") (emphasis added), and reiterated in *Blinded Veterans Ass'n,* 872 F.2d at 1043 ("a court may *require the competitor to take whatever steps are necessary to distinguish itself* or its product from the first organization or product") (emphasis added). Arrow has not met this obligation. In combination, its use of the phrase "Swiss Army knife," for so long exclusively associated with Victorinox and Wenger, and its use of several approximated features of Forschner's trade dress add up to an actionable "cumulative absence of differentiation." *Ritchie,* 281 F.2d at 759.

Arrow has taken more than the law allows. A junior competitor cannot be enjoined from taking advantage of general good will built up in the public for a particular product. But legitimate entrepreneurial endeavor ends where passing off begins. *See, e.g., Kellogg,* 305 U.S. at 122, 59 S.Ct. at 115; *Am. Footwear,* 609 F.2d at 662. I cannot find that Arrow has given the consumer "fair notice" that it is the source of its Swiss Army knife. *Blinded Veterans Ass'n,* 872 F.2d at 1045 n. 22. On the contrary, it is "specific actions by [Arrow] that increase the risk of confusion." *Id.* at 1046. A comparative analysis of the total physical images of the two knives indicates a strong likelihood that the effect of Arrow's actions is to induce the public to think that Arrow is Forschner.

■ In failing to identify itself and give the consumer fair notice that it, and not Forschner, is the producer of its knife, Arrow defies the central purposes of the laws of trademark and unfair competition, all of which are predicated on the "source-distinguishing ability of a mark." *Qualitex Co. v. Jacobson Prod. Co., Inc.,* —— U.S. ——, ——, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248 (1995). These purposes include: (1) reducing the time and cost of shopping and purchasing decisions by assuring the consumer of consistent quality from the goods whose mark is already recognized; (2) rewarding the producer who has invested time, money and effort in developing his mark; (3) discouraging producers of inferior products from profiting by consumer confusion; (4) fostering competition; and (5) maintaining product quality and producer accountability. *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985); *Qualitex,* —— U.S. at ——–——, 115 S.Ct. at 1303–04 (citations omitted).

## C. Consumer Perception Survey Evidence

 Arrow argues that the consumer perception survey commissioned by Forschner ("Forschner survey"), and designed to demonstrate at trial the qualitative and geographic descriptiveness of "Swiss Army knife," cannot be used on remand to demonstrate a likelihood of consumer confusion. Forschner in response has submitted an affidavit from Dr. Joel Cohen, the expert who originally prepared and interpolated the survey data. See Affidavit of Joel B. Cohen (November 7, 1994) ("Cohen Affidavit"). Dr. Cohen "re-coded" the results of the first survey, finding that the answers given by consumers to the survey questions also indicated a strong likelihood of confusion, *i.e.*, mistaking the Arrow Swiss Army knife for the Forschner Swiss Army knife. Arrow counters that Dr. Cohen has impermissibly "reinvented" the Forschner survey by manipulating the data in order to sustain Forschner's remaining claims. See Defendant's Memorandum of Law on Remand, at 20. Arrow requested that it be allowed to cross-examine Dr. Cohen in the event that I were to rely on his affidavit in reaching my decision. After accepting submission of the affidavit, however, I chose not to rely on it in deciding the efficacy of the survey on the issue of consumer confusion.

Even without the Cohen Affidavit, I find that the Forschner survey does in fact demonstrate consumer confusion. In so finding, I rely on the results of the survey, both directly and as they were presented by Dr. Cohen's testimony and written report. See Plaintiff's Ex. 34, Consumer Perception of a Multi-Function Knife ("Cohen Report"). After trial, I found "a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the geographic origin and quality of the [Arrow] knife." *Forschner,* 833 F.Supp. at 391 (citation omitted). Today, I find that a likelihood of confusion as to origin is also demonstrated by the survey.

Although it found that the phrase Swiss Army knife was neither geographically nor qualitatively descriptive, the Court of Appeals did not impeach Forschner's survey in the process. Factual findings at trial aside, the Court decided as a matter of law that the phrase was incapable of geographic descriptiveness and, therefore, of qualitative descriptiveness. See *Forschner,* 30 F.3d at 354–55. In so doing, it separated the issue of descriptiveness from the issue of consumer confusion:

> [i]n applying the 'likelihood of confusion' test, a court may rely upon its own observations and other evidence, including survey evidence, as may be required. But the distinct issue of whether or not a phrase lends itself to being construed as a statement of geographic origin can be determined without reference to evidence of consumer confusion or lack thereof.

*Id.* at 354 (citations omitted).

In finding a lack of geographic descriptiveness, therefore, the Court of Appeals did not rule on consumer confusion.

 Contrary to Arrow's allegations, the Forschner survey competently addresses consumer confusion. To be probative, a survey must be fairly prepared, directed to relevant issues and not suggestive of any particular response. See *Sterling Drug, Inc. v. Bayer, AG,* 14 F.3d 733, 741 (2d Cir.1995); *Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 118 (2d Cir.1984). Arrow does not argue that the survey was unfair or suggestive and, although specifically directed to the issues of geographic and qualitative descriptiveness, a crucial part of the survey was more generally directed to the broader issue of consumer confusion as well. In this respect, our facts are distinguishable from those in the cases cited by Arrow. In these cases, the design of the survey was clearly incompatible with its subsequent attempted use. Plaintiffs there were attempting to use a more general survey design for the precise and particular task of placing a contested mark somewhere on the spectrum of distinctiveness. See *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 793 n. 4 (5th Cir.1983) (survey designed to explore likelihood of confusion not probative as to whether trademark is suggestive or descriptive); *In re Minnetonka, Inc.,* 212 U.S.P.Q. 772, 778 n. 9 (T.T.A.B.1981) (survey relevant to test secondary meaning not probative on issue of

genericness); *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655, 665–66 (7th Cir.1965) (survey designed to show public awareness of company name not probative on issue of genericness).

The Forschner survey elicited consumer responses to a series of questions relating to a color photograph of the Arrow knife accompanied by a catalog-styled heading that read "11–Function Swiss Army knife" and was followed by a description of the knife.[20]

Of the 380 people who completed the survey, 333 indicated some familiarity with the name "Swiss Army knife." See Forschner Survey question 7. These people fell into three categories: (1) persons who had bought or use(d) a Swiss Army knife (190); (2) persons who had examined a Swiss Army knife or discussed Swiss Army knives with someone (87); and (3) persons who had heard of Swiss Army knives (54). See Cohen Report, at 6. All participants were screened as potential purchasers of a multi-function pocket-knife.

When asked if there was anything about the Arrow Swiss Army knife that "leads you to believe it is manufactured to be of high quality?", 301 of the 380 answered affirmatively. See Forschner Survey question 2. Those who answered affirmatively were asked two "follow-up open-ended" questions designed to elicit why this association had been made. See Cohen Report, at 7. The questions were, "What is there about this multi-function knife that leads you to believe it is manufactured to be of high quality?" and "Is there anything else about this multi-function knife that leads you to believe it is manufactured to be of high quality?" See Forschner Survey, questions 3 & 3a. It is in these open-ended questions, which do not direct the consumer to any particular aspect of the product but rather simply ask why the consumer has just answered as he or she did, that confusion as to origin is apparent.

Dr. Cohen organized answers to the two follow-up questions into seven categories. The first three include answers which: (1) make specific reference to Swiss Army as a brand name or to the cross-and-shield logo; (2) refer to the reputation of an unnamed but well-known manufacturer; and (3) describe the knife pictured as similar to one owned or used currently or in the past. Dr. Cohen analyzed the combined responses of these three groups in a "summary response category," also called "the familiar knife" category. See Cohen Report at 9. Even in his original report, Dr. Cohen found this summary category provided "*an additional way of thinking about the essence of the first three responses,*" in particular for "*judging the potential for consumer confusion in responding to a catalog presentation of such a knife.*" Id. at 9–10 (emphasis added).

Answers from the summary category—indicating reliance on personal knowledge, reputation, or name recognition—include the following:

007 "No I had a knife similar to it when I was in the service myself and they were pretty good knives I get them off the base."

008 "Swiss Army is a well known name for many years."

019 "I have one, it's not the same style as this one, mine is the mountain one."

021 "The name Swiss Army knife."

041 "Swiss Army has a good reputation—they make good knives."

---

**20.** For a more detailed description of the survey, see *Forschner*, 833 F.Supp. at 390–92. Arrow again argues that the survey is unreliable because the photograph used was a hypothetical advertisement and not Arrow's actual advertising. See Defendant's Memorandum of Law on Remand, at p. 23. This is not fatal. Having compared the survey photograph and layout with that in an Arrow catalog, I find that the former is a close and fair approximation of the "actual market conditions" of the latter. *See Mattel, Inc. v. Azrak–Hamway Int'l, Inc.*, 724 F.2d 357, 361 (2d Cir.1983) (noting, in a case in which no survey was offered, that "a usual way to demonstrate consumer confusion ... is some form of survey of consumer attitudes under actual market conditions"); *The Scotch Whiskey Ass'n v. Consol. Distilled Prod., Inc.*, 210 U.S.P.Q. 639, 643, 1981 WL 40524 (N.D.Ill.1981) ("While the Court is mindful that the survey was not performed in an actual market purchasing situation, it does not deem that fact to significantly undermine the weight of the survey findings...."). Persuasive on this point are both Dr. Cohen's report, *see* Cohen Report, at 3, and his testimony. *See* Tr. at 362–369.

051 "It's a Swiss Army knife and they are thought to be of high quality."

058 "It looks just like the one I have."

080 "I already use it and I know from experience it is good."

094 "If it's a Swiss Army knife it would be high quality. It's a reputable company that makes this knife."

118 "It's got a good reputation and that's hard to have nowadays."

172 "The logo, the Swiss Army with the white cross."

650 "The Swiss Army brand is a good, well-known brand that has been around for years."

655 "It says Swiss Army, these have been around for a long time. I have a friend that owns one."

668 "Usually a Swiss Army knife are real good, that's what I have always heard."

Forty-three percent of those surveyed fell into the summary category. See Cohen Report at 9. Even without the benefit of an expert, it is clear to me that their responses indicate confusion between the Arrow Swiss Army knife shown in the survey and the Forschner (or Precise) Swiss Army knife that they have owned, used or otherwise become familiar with through reputation or name recognition. This last group alone, those consumers that are most likely to associate the name "Swiss Army knife" or the cross-and-shield logo with the Forschner knife, accounts for 34% of those survey. Id. at 8. Clearly, there is confusion here between a junior user's product freshly put out to market and a senior user's similarly dressed, identically named product invested with the kind of good reputation and good will that only hard work and time can create. Thus I find again, as I found after trial, that the consumers' response "indicated that they had in mind a Swiss Army knife manufactured by Victorinox or Wenger." *Forschner,* 833 F.Supp. at 391.

Even cutting in half the percentage of consumers in the summary category, the remaining figure of 21.5% is well within the range acceptable as probative of confusion. *See, e.g., RJR Foods,* 603 F.2d at 1061 (15%–20% rate probative of confusion); *Grotrian,*

*Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons,* 365 F.Supp. 707, 716 (S.D.N.Y.1973) (7.7% and 8.5% rates "are strong evidence of the likelihood of confusion"), *aff'd,* 523 F.2d 1331 (2d Cir.1975); *The Scotch Whiskey Ass'n v. Consol. Distilled Prod., Inc.,* 210 U.S.P.Q. 639, 643, 1981 WL 40524 (N.D.Ill.1981) (rate of "significantly less than 25%" sufficient to show confusion).

### III. Unfair Competition under State Law

■ In New York, as elsewhere, the common law of unfair competition encompasses a broad range of unfair practices. *See Am. Footwear,* 609 F.2d at 662; *Flexitized, Inc. v. Nat'l Flexitized Corp.,* 335 F.2d 774, 781 (2d Cir.1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965). "[T]he essence of unfair competition claims under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34 (2d Cir.1995) (citations omitted).

■ Unlike unfair competition claims brought under § 43(a) of the Lanham Act, however, claims brought under New York common law do not require proof of association of origin. "[A] showing of secondary meaning is not necessary to prove unfair competition under New York State common law.... To prevail on a state law claim, [plaintiff] need only demonstrate a likelihood of confusion." *Coach Leatherware,* 933 F.2d at 169 (citing *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 618 F.2d 950 (2d Cir.1980), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982)); *see Avon Periodicals v. Ziff–Davis Pub. Co.,* 282 A.D. 200, 122 N.Y.S.2d 92 (1st Dep't 1953); *Santa's Workshop, Inc. v. Sterling,* 282 A.D. 328, 122 N.Y.S.2d 488 (3d Dep't 1953); *see also Speedry,* 271 F.2d at 649–50 (distinguishing misappropriation cases in which secondary meaning is unnecessary from traditional "passing off" cases in which a secondary meaning is implicit); *Milstein,* 58 F.3d at 34 (an unfair competition action for damages requires a showing of actual confusion,

whereas an action for equitable relief requires a showing of a likelihood of confusion).

Having found above that Forschner has demonstrated a likelihood of consumer confusion, I find further that it has also made "some showing of bad faith." *Milstein,* 58 F.3d at 35, *citing Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980). There is little in the federal or state case law in this Circuit to distinguish "intentional copying" as proof of unfair competition under § 43(a) of the Lanham Act from "bad faith misappropriation" under state common law. It would appear, however, that bad faith can be inferred from the facts and is closely related to likelihood of confusion. Arrow President Mark Dweck testified that Arrow was aware of the use of "Swiss Army knife" to describe other multi-function pocket-knives.[21] Arrow nevertheless used this phrase, and combined it with trade dress similar to Forschner's, to describe its own multi-function pocketknife. The record supports a finding that Arrow made "a deliberate attempt to exploit purchaser familiarity with the name" and dress of the Forschner knife. *Flexitized,* 335 F.2d at 782. Forschner has thus adequately supported its allegation of unfair competition under New York common law.

## IV. Relief

Forschner has asked for injunctive relief. The relief granted should go only so far as to alleviate the source confusion caused by Arrow, and no further. The relief named here is designed to protect Forschner from unfair competition without unnecessarily burdening Arrow. I thus order that Arrow, although free to use the phrase "Swiss Army knife" to designate its product, must amply distinguish it from the Forschner product. Two salient means that come to mind are changing the color of its knife to a color not used by Forschner and adding its name to its designation of its knife, *i.e.,* "The Arrow Swiss Army Knife," or "The Swiss Army Knife by Arrow."

There is ample precedent for such relief. Judge Ginsburg, in *Blinded Veterans Ass'n,*

for example, noted that because that case dealt with the designation of an organization rather than a product, she was prevented from "such a remedy as attaching the manufacturer's name to the generic name of the product." *Blinded Veterans,* 872 F.2d at 1047. In *Kellogg,* the defendant's prominent display in "bold script" of the Kellogg name on packages of shredded wheat helped to distinguish its product. Other examples abound. *See Miller Brewing Co. v. Jos. Schlitz Brewing Co.,* 605 F.2d 990, 997 (7th Cir.1979) (defendant had not passed itself off as plaintiff because defendant had adequately identified itself by preceding its use of the generic "Lite Beer" with "Schlitz," the producer's name); *King–Seeley Thermos Co. v. Aladdin Indus., Inc.,* 321 F.2d 577, 581 (2d Cir.1963) (defendant can use the generic term "thermos" but must distinguish its product from plaintiff's by, *inter alia,* preceding "thermos" with "Aladdin's"); *DuPont Cellophane Co. v. Waxed Prods. Co.,* 85 F.2d 75, 80, 82 (2d Cir.) (defendant can use the generic term "cellophane" but must, in some circumstances, identify itself as the source so as to avoid consumer confusion), *cert. denied,* 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936); *Warner Bros. Pictures v. Majestic Pictures Corp.,* 70 F.2d 310, 312–13 (2d Cir. 1934) (defendant can use the generic film title "Gold Diggers," provided it is accompanied by the producer's name and a disclaimer of affiliation with the plaintiff's film "The Gold Diggers"); *Barton v. Rex–Oil Co.,* 2 F.2d 402, 406–07 (3d Cir.1924) (defendant can use the phrase "Dye and Shine" provided it add a prominent disclaimer distinguishing its product from plaintiff's "Dyanshine"); *Singer Mfg. Co. v. June Mfg. Co.,* 163 U.S. 169, 204, 16 S.Ct. 1002, 1015, 41 L.Ed. 118 (1896) (defendant can use the generic name "Singer" but not "without clearly and unmistakably stating ... that the machines are made by the defendant" as distinguished from those made by plaintiff).

Although a traditional trade dress infringement case rather than an unfair competition case, *Merriam–Webster v. Random House,* recently decided by the Court of Appeals, is particularly instructive in light of its similar

**21.** *See* n. 17, *supra.*

facts. In *Merriam–Webster*, both dictionary publishers used red backgrounds for their book jackets, which both featured the generic terms "Webster" and "college." The Court of Appeals reversed the trial court's finding of likely confusion, however, at least in part because of the repeated appearance on the jackets of the competing publishers' names and the use of the "bull's eye" logo on the Merriam–Webster jacket and the "house" logo on the Random House jacket. *Merriam–Webster*, 35 F.3d at 71 ("The conspicuous use of very different logos and of the names of the publishers significantly distinguishes the two trade dresses."). *See also Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1045–46 (2d Cir.1992) (despite many similar trade dress elements, "the prominence of the trade names on the two packages weighs heavily against a finding of consumer confusion").

The confusion among consumers caused by Arrow is not solely the result of its use of the phrase "Swiss Army knife." The trade dress of the knife, particularly its red color, has substantially increased the risk of confusion, which risk was compounded by Arrow's failure to accompany its product with a fair statement of the ownership and source of manufacture. *See Blinded Veterans Ass'n*, 872 F.2d at 1045 ("A second manufacturer may increase the likelihood of confusion by, for example, using a similar label, similar packaging, misleading advertising, or simply by failing to state the product's source.").

### CONCLUSION

The above statement constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

Forschner has proved that Arrow violated § 43(a) of the Lanham Act and New York common law by engaging in unfair competition. Within two weeks of the date hereof, plaintiff shall submit on three days notice a proposed judgment consistent with the findings and conclusions herein.

SO ORDERED: